## THE NORGE.

### (District Court, S. D. New York. October 8, 1907.)

SHIPPING—LIMITATION OF LIABILITY—LOSS OF VESSEL AT SEA.

Evidence considered, and *held* to entitle the owner of the Danish steamship Norge to a limitation of liability on account of her loss at sea while on a voyage from Copenhagen to New York through striking a derelict or unknown obstruction under the surface of the water to the southward of Rockall Rock, by which she was so injured that she sank in 20 minutes, and a number of persons lost their lives; it being shown that she was seaworthy and properly manned and equipped, that she was on an approved route with a lookout properly stationed, and that there was no fault or negligence in her management. Claims made by representatives of persons who lost their lives by the disaster also dismissed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 644, 645.

Limitation of liability of vessel owner, see note to The Longfellow, 45 C. C. A. 387.]

In Admiralty. Proceeding for limitation of liability.

Wing, Putnam & Burlingham, for petitioner.
Henry M. Heyman, for various claimants.

ADAMS, District Judge. A petition was filed herein by Det For-ende Dampskibs-Selskab (The United Steamship Company) as owner of the steamship Norge to limit its liability by reason of the sinking of that steamer on the morning of the 28th of June, 1904. The steamer was proceeding from Copenhagen to New York via Pentland Frith and the Flannan Islands. The allegations of the petition are, inter alia:

"Fifth: After sailing from Christiansand and on June 25th, 1904, the steamship Norge, with all her equipment, (excepting three boats as hereinafter stated) and all the cargo, effects and baggage on board were totally lost at sea on June 28th, 1904, in the following circumstances:

The Norge passed through the Pentland Firth, on the 26th, and was abreast of Butt of Lewis at 8 A. M. on the 27th. At 11.40 A. M. on the 27th she was abreast of the Flannan Islands, in 58° 22′ North latitude, and 7° 38′ West longitude. From this point the usual steamship route was to follow the great circle, passing south of Rockall Rock, and the course was set thence West by North by compass to allow for deviation, which should take the ship well to the South of Rockall Rock, which is a well known reef or cliff about 70 feet high and about 220 feet in circumference, situated about 220 miles from the Flannan Islands. It is surrounded by an area known as the Rockall Bank, extending in length 150 miles in a Northeasterly and Southwesterly direction, and about 45 miles in width. There are known to be submerged rocks or reefs in this area North of the Rockall Rock, and there is a submerged rock known as St. Helen's Reef about two miles East of the Rockall Rock, but no rocks or reefs South of Rockall Rock were known. The vessels of this Line and other Steamship Lines had repeatedly crossed the Rockall Bank South of the Rockall Rock and close to it, and the charts as well as repeated soundings made upon the Bank South of the Rock had there shown a depth of fifty fathoms, and had not disclosed the existence of any reefs or rocks in that locality. Since leaving Copenhagen the Norge's compasses had been daily tested and observed, but no unusual deviation indicated.

Sixth: The Norge proceeded on this course from the Flannan Islands at the rate of about 10¾ knots per hour. The weather was clear with a moderate Southerly wind and an unsteady swell from the Southwest. At seven thirty P. M. the ship's course was verified from the position of St. Kilda, which was still in view on the horizon.

At 5 o'clock in the morning of the 28th, the same course and speed having been maintained, the weather became somewhat hazy, and a lookout was stationed forward. The patent log indicated a run of 178.6 miles, which corresponded with the normal full speed of the ship. As they might not sight Rockall Rock owing to the weather, the master for abundant precaution and in order to allow for any unusual drift or unexpected deviation, changed his compass course to W. S. W. This course was maintained at full speed until 7.30 A. M., when it was reckoned that a distance of 27 miles had been made. The course was then changed back to West by North the weather being then fairly clear, so as to see a good distance. After running on this course 2½ or 3 miles, at about 7.45 A. M. the ship struck hard upon an unknown obstruction, without any object having been sighted by either the lookout or any other person on board.

The engines were reversed, and the ship came off. The boats were immediately ordered cleared away, but owing to the settling of the bow, and the crowding of the passengers, only five boats could be launched from the ship, and of these one was badly damaged. The Norge sank in deep water in about twenty minutes.

The boats stood by until the ship sank and picked up all the people they could. The weather was then thick and rainy and the boats drifted in a Northerly direction. After more than two hours, the weather cleared somewhat, and one or two persons in the boats thought that they caught a glimpse of a rock about four miles to the Northwest. Subsequently, after several days, the occupants of said five boats, which had become separated, were

rescued by different ships, the occupants of one boat being landed at Stornoway, Hebrides, those of another boat at Grimsby, of another at the Faroe Islands and of another at Aberdeen. Of those on the Norge, all were lost excepting the persons thus saved in these five boats being 143 passengers and 24 of the crew."

Then follow the usual averments in a case of this kind, further showing the necessity for the proceeding by reason of actions brought in New York against the petitioner to recover various large sums. The petition further shows a number of existing claims, not in suit, due to the steamer's loss. The ordinary proceedings ensued which resulted in the presentation of the claims in suit, in which answers were filed on behalf of the estates of 12 drowned passengers. They denied many of the petitioner's allegations and further answering averred:

That the loss was caused wholly by unseaworthiness of the vessel and by the negligence of those in charge of the vessel, as follows:

"(1) That the said steamship when she went to sea was unseaworthy and unfitted to encounter the ordinary perils of navigation. That her several bulkheads were imperfectly and defectively constructed and unable to sustain the weight of water which would press upon them through a leak or hole in said steamship below the water line thereof. That said steamship was built many years ago, and had been in long active and continuous service.

(2) That she was not equipped with a sufficient number of life boats or life preservers, nor provided with the usual and ordinary life saving devices and appliances.

(3) That she was insufficiently manned and equipped, and was not provided with a full, complete, adequate and competent crew, or with proper officers to manage and navigate said steamship.

(4) That she had no competent and sufficient lookout properly stationed and attentive to his duties as such, and engaged in the proper performance thereof.

(5) That the said S. S. 'Norge' took no timely or proper steps to avoid the accident or foundering on the rocks whereon and whereby she was sunk, as she was bound by law to do.

(6) That said steamship 'Norge' was not provided with a full complement of licensed officers sufficient at all times to manage said steamship; that such officers were incompetent, inexperienced, and not properly qualified to perform the duties ordinarily required of them; that the crew of said steamship was composed mainly of young, inexperienced and incompetent boys and men, almost all of whom deserted their posts of duty and were insubordinate, panic stricken, not amenable to orders, were unruly, intoxicated, violent, obstructive and utterly regardless of the lives or safety of the passengers on said steamship 'Norge,' or of any of them; that the captain, officers and crew of said S. S. 'Norge' were in a state of drunkenness and intoxication, and unmindful of their several duties, during the entire voyage, and of the lives and safety of the passengers committed to their charge."

Upon the issues raised a great deal of evidence was taken abroad for the petitioner, and some here. The latter was by deposition and the subsequent examination of a witness for the petitioner in court. The claimants called and examined in court two of the immigrant passengers who were on the steamer, but this testimony did not serve to contradict the petitioner's proofs, but merely tended to show that when the accident was happening there was trouble about some of the passengers being taken into the saving boats.

It appeared that the Norge maintained a high class in the Bureau Veritas and was seaworthy in every respect. She had been inspected just before her departure on this voyage and found to be not only sea-

worthy as to her hull but that she carried a full crew and complement of boats and life saving apparatus. Her officers and crew were well qualified. She had a small number of boys on board but they were competent to perform their duties and no real criticism can be made against the steamer in such respect. There was no evidence whatever of intoxication on board. The crew was regularly served with an ordinary beer at meals which would only produce intoxication when used in excessive quantities and that does not appear to have been the case here.

The master of the vessel had had considerable experience and in following the route adopted, he was not only acting upon his own knowledge and that of other masters but was navigating in conformity with the recommendations of the German Hydrographic Office. He remained on the bridge until the vessel went down and was rescued from drowning by one of the saved boats. His account of the accident was as follows:

"Seventh Interrogatory:

State particularly the navigation of the Norge on June 28th, giving the weather, the wind, and course of the vessel, on that day, up to the time of her loss. State who were on the bridge of the vessel on the morning of that day, who, if any one, was on the lookout, and at what time the vessel struck or stranded, and whether the object struck was seen by anyone upon the ship. A. The course on the 28th was true S. 74° W., but as the variations increased and the course was unaltered from the 27th, it became somewhat more southerly in reality. In the morning of the 28th June at 5 o'clock, the distance sailed from Flannan Isles being then 179 miles, I was informed that it was somewhat hazy, which, however, only lasted a moment. For the sake of caution, the course was altered to S. 42° W. The ship ran out a distance of 27 miles on this course until 7–30 a. m., when the course was again altered to the previous one, and I consider we were a good deal south of all grounds even should the current have placed us some miles towards the north. The weather was clouded but clear, the wind south, force one. We ran three miles on this course when the ship struck at 7–45 a. m. The first officer, Gilbe, was on the bridge and the sailor Hannibal Christensen was on the lookout at the time of stranding. I was myself on the bridge at 5–30 a. m. and continually from 6–15 a. m. together with Gilbe. The object struck was not seen by any one previous to striking, but immediately afterwards a quantity of wreckage was noticed.

Eighth Interrogatory:

After the stranding, state what precautions were taken how soon the boats were lowered away, the number of boats launched, and how long the Norge remained afloat; and if she sank, at what time she sank and in what manner. State also what became of the boat in which you were, and also of the other boats so far as you know, giving the number of passengers and crew who were rescued. A. After the stranding I steamed full speed astern, which was considered the best under the circumstances. I endeavored to manoeuver the ship round in order if possible to get back to a fishing steamer, which had been passed at 6 o'clock in the morning and was still visible at 7 o'clock, which is also a proof that the weather was not hazy. The endeavor to turn the ship round had shortly afterwards to be given up as she did not answer to her helm, more especially on account of her fore part sinking quickly, thereby lifting the after part so that the propeller was out of the water. Under these manoeuvers, orders were given to sound the fore part of the ship, and immediately afterwards I was informed that there was water in the fore part. I gave orders to close all water-tight doors, and to inform all the passengers to come on deck with lifebelts on. I ordered the engine room to pump the fore part of the ship, to get the boats ready and to lower them to the rail, but as I saw how quickly the ship sank I gave orders to put the boats out. Further, I gave orders to bring further provisions to the boats, to bring for-

ward the ship's journals, to arrange for women and children to go first into the boats, that the crew should refrain from entering the boats, to cut all lashings on everything which could float, as well as on the raft. The steam whistle was continually used. At the time the ship struck, it became a little hazy with rain. I also convinced myself that several of my orders were carried out. I was informed from the engine room that the watertight doors were closed and that pumping of the fore part of the ship had been commenced. When the water reached the entrance to the engines, I gave orders for the engine room staff to come up on deck. Up to this time, when I should say about 10–15 minutes had gone since the time of striking, 7 of the boats had been got out. The eighth boat was got out with great difficulty just before the ship sank. On the whole, the lowering of the boats was made very difficult through the ship lying over at the stem and through the large number of passengers in the beginning struggling to get into the boats. The steamer sank at 8–05 a. m., after floating about 20 minutes. During the time after the ship struck, I left the bridge twice, the first time when No. 1 boat was launched in order to get as many of the women and children into the boats as possible, in which I was also successful. When lifeboat No. 2 was being lowered, the tackle falls became fastened against the bridge on account of the heeling of the ship, which made it impossible to get it away. I gave orders to the carpenter who was employed in the lowering of the boat, to cut the tackle, which was also done. The ship sank with her forepart downwards. I was not in any boat when the ship sank, but was drawn under the water, and after swimming about for about 1 hour 25 minutes, I was picked up by lifeboat No. 1, which was still drifting about the place without being manoeuvered. Sail was rigged after I regained my strength, and my intention was, if possible to endeavor to reach St. Kilda, should we not be found by some passing steamer; as it seemed clear to me—the boat being over-filled with people—that we must spare the provisions and water, and these were only given out in small proportions. At 5 o'clock a. m. on the 2nd July, we made signal to an east bound steamer, but were not observed. A child died on the same day named Alfred Emil Constantin Henderson, which was buried at sea with the consent of the parents. On the 3rd July at 5 A. M. signal was made to a sailing vessel, but it was not observed. In the afternoon of the same day, about 12–30, we sighted St. Kilda, and in the evening made signal to a steamer, which turned out to be S/S Energy, Captain Schaffer, and by which steamer we were picked up. The bearing of St. Kilda was about 18 miles south. As we all suffered considerably, it was decided, with the consent of Captain Schaffer to let S/S Energy call in at Stornoway in order to land us there so that we might come under the Doctors' treatment. We were landed at Stornoway in the afternoon of the 4th July. We had been 71 in the boat.

As far as I know, the passengers and crew of No. 3 boat were picked up on the 29th June at 7 o'clock a. m. by the fishing steamer Salvia and were brought to Grimsby. No. 5 boat was picked up in the afternoon of the 4th July by S/S Largo Bay and was landed at Aberdeen. No. 7 boat was broken in lowering. No. 2 boat has not been heard of since. No. 4 was discovered by Olga Pouline on the 5th July and brought in to Thorshavn on the Faroe Isles. No. 6 boat went down. No. 8 boat was picked up by Savona on the 3rd July in the evening and brought into Stornoway. In all, 143 passengers and 24 of the crew were in these boats.

Ninth Interrogatory:

How do you account for said accident? State why the same occurred and whether the same might have been avoided on your part or the officers of said vessel. A. I cannot give any explanation of the disaster, neither do I know whether and on what ground she struck, as the ship, according to the course set, should have been a long way south of Rockall. Some have stated that there have been magnetic influences, but I am unable to express myself as to this. The disaster could not have been avoided by my aid, neither do I consider any negligence on the part of the officers and crew has been prevalent."

156 F.—54

It appears that the vessel either struck a derelict, which the floating wreckage would seem to indicate, or some unknown rock or obstruction causing the sinking and the consequent loss of life. The evidence sustains the account set forth in the petition, as quoted above, and nothing has been offered to meet it.

A special exemption from liability was claimed under the laws of Denmark, as the law of the Norge's flag. According to this law, it is claimed that a shipowner is not liable in damages for loss of life on his vessel unless the loss was occasioned by acts of the owner of a criminal nature so as to constitute the crime of manslaughter under the provisions of the Danish law defining such crime, but it is not necessary to consider this feature of the case as the evidence shows that the loss of life was not caused by any defect in manning or outfitting the vessel or, in fact, any negligence of those on board.

There will be a decree sustaining the petition and dismissing the claims.