### In re MURPHY.

District Court, S. D. Alabama.   August 7, 1928.

1. **Shipping ⬤══209(3)—Evidence held to establish sinking of ship was by reason of striking submerged object, entitling owner to limitation of liability to charterer.**

Evidence in owner's application for limitation of liability *held* to establish that sinking of vessel was by reason of striking some submerged object with sufficient force to break her plating and let in water at a time when ship was seaworthy, so as to entitle owner to limitation of liability to charterer.

2. **Shipping ⬤══207—Act of mate in requiring crew to discard personal effects when taking to lifeboats held justified, as respects owner's limitation of liability.**

Act of mate, as bearing on owner's right to limitation of liability, in requiring members of crew to discard clothing and personal effects when taking to lifeboats, *held* justified, since human life is first to be considered, whether or not there was room enough in boat for both the men and effects.

3. **Shipping ⬤══207—As to limitation of liability, owner of foundered vessel, collecting insurance thereon, will be required to furnish transportation to members of crew to home port.**

As to limitation of liability, where owner of foundered vessel had insurance to amount of $75,000, covering him for loss of ship, he will be required to furnish transportation to members of crew to home port after having been prematurely discharged.

In Admiralty.   Petition of John G. Murphy for limitation of liability.   Decree in accordance with opinion.

Harry T. Smith & Caffey, of Mobile, Ala., for petitioner.

Pillans, Cowley & Gresham, of Mobile, Ala. (Alexis T. Gresham, of Mobile, Ala., of counsel), and Burlingham, Veeder, Masten &. Fearey, of New York City (Roscoe H. Hupper and William J. Dean, both of New York City, of counsel), for Virginia-Carolina Chemical Corporation.

Jessie Hogan, of Mobile, Ala., for various seamen.

ERVIN, District Judge.   The Rose Murphy was under charter to the Virginia-Carolina Chemical Corporation to carry a load of phosphate rock, and, after loading the cargo and starting on her trip around the Florida cape, she foundered, and everything was lost, except the crew, who took to the lifeboats and made it ashore.

The testimony satisfies me that the petitioner did all he was required to do in having the vessel put in seaworthy condition, and kept so, before and during the trip. The real controversy arises over the question of whether or not the foundering of the vessel was brought about by some member or members of the crew opening the seacock and deliberately sinking the ship, or whether she struck some sunken object and tore a hole in her hull, and so let the water in.

There is no definite proof of exactly what caused the sinking. She was going along about 12:30 at night in a pretty good breeze and having some seas, but not to amount to much, when suddenly a shock was felt, and in a few minutes water was found rushing into the engine room, and after a time the fires were put out by it, the pumps stopped, and the vessel sank just after daylight the next morning.

It is significant to me that all of the officers and white men who were on the boat, who testified, spoke of it, in describing the shock, as the vessel striking some sunken object, which caused her to pause for a moment and then go ahead, while the sailors, who were all negroes, testified that the concussion or shock was caused by the sudden reversal of the propeller. Several of the negro sailors gave statements prior to their testifying in court, in which statements they refer to the shock just as the officers did; but, when it came to testifying, they were positive it was not a collision, but was a reversal of the propeller, which caused me to believe that they had gotten together and agreed on their story. Shortly after they were landed, they held a conference and agreed among themselves on their line of conduct and the demands they would make, and appointed a spokesman, who would represent them and act in concert all the way through.

After observing them carefully, and observing also the testimony of the officers, I am satisfied that the story told by the white officers is more correct. The testimony as to the launching of the lifeboats shows that they were stuck in their places, and it was with considerable difficulty that they were launched, and much time was taken to get them launched. When one of the boats was put overboard, she commenced to make water and had to be bailed, and it was found that a stopper used to plug a hole in her bottom

was out, and it was only after some time that this stopper was found in the bottom and the hole plugged. I cannot conceive how any man would deliberately sink a vessel on which he was traveling without making timely and adequate provision for his own escape, at least, and there is no evidence of any such effort being made.

The owner had the ship insured for $75,000, and had arranged to have this sum increased to $100,000, within a short time. Surely, if he were going to have the ship scuttled for the insurance, he would have waited until he could have collected the other $25,000.

One of the seamen, the one who was at the wheel when the shock was felt, testified to a conversation he heard between the master and one of the other officers, previous to the sinking. This man, when the shock took place, started to leave the wheel and was told by the master to stand by the wheel; but, as soon as the master's back was turned, he deserted the wheel and went below to get his effects. He showed on the cross-examination considerable irritation and surliness, and, on the whole, I am satisfied that his story as to the conversation was a fabrication.

[1] While there is no direct proof of what it was the vessel struck, the evidence has satisfied me that the ship did strike some submerged object with sufficient force to break her plating and let in the water, and I am further satisfied that she was at this time seaworthy. I think, therefore, the owner is entitled to a limitation of his liability to the Virginia-Carolina Chemical Corporation.

[2] The members of the crew have filed two classes of claims; one being for the loss of their clothing and personal effects, and the proof as to this was that a number of the sailors, when the report was made that the vessel was making water rapidly and would sink, gathered up their personal effects and put them in suit cases, grips, and bundles, and threw them in the lifeboat. One of the mates, who was present, made them put the plunder back on the vessel, where it was left and went down with it. In my opinion, the mate was correct, as human life is first to be considered, and, while it was possibly the case that there was room enough in the boat for both the men and the plunder, I think the act of the mate was justified.

[3] The other claim was for their transportation to the home port, Mobile, from Key West, Fla., where they landed and were paid off. The sailors' right to transportation to the home port when they are prematurely discharged, does not in my opinion come under the limitation of liability acts. The owner is not seeking to limit a liability for any tort committed by the ship on the sailors, nor for a breach of any contract of carriage with him, nor for any embezzlement or tort committed by any member of the crew on him or any of his property. What "act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred" by the ship, is sought to be limited by this proceeding? The statutes all had in contemplation a limitation of the owner's liability for the failure of the ship to carry passengers or freight, or for some tort committed by the ship on some other ship, property, or person, or some loss to the shipper of goods by reason of the embezzlement or tort of some member of the crew; the claim here asserted by the seamen does not come under any of these classes, but arises by reason of their premature discharge at a port other than at which they shipped. Again, admiralty courts are expected to do complete justice wherever they can, and in this case the owner has insured to the amount of $75,000, which covers him for his loss of the ship, and I think it would be inequitable, under these facts, for the owner to collect his insurance and not send the men back to the port of shipment.

A decree will be entered in accord with this opinion.