## VIRGINIA–CAROLINA CHEMICAL CORPORATION v. MURPHY.

## THE ROSE MURPHY.

Circuit Court of Appeals, Fifth Circuit.
April 15, 1929.

No. 5491.

Roscoe H. Hupper, of New York City, and Palmer Pillans and Alexis T. Gresham, both of Mobile, Ala. (Pillans, Cowley & Gresham, of Mobile, Ala., and Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, on the brief), for appellant.

William G. Caffey and Harry T. Smith, both of Mobile, Ala., for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. The steamship Rose Murphy, while bound from South Boca Grande, Fla., to Pinners Point, Va., with a cargo of phosphate rock, foundered in the Straits of Florida. There was a total loss of ship and cargo. The charter party contained a warranty by the shipowner of seaworthiness subject to the exemptions from liability contained in the Harter Act (46 USCA §§ 190–195), and excepted "dangers and accidents of the seas," and any extraordinary occurrence beyond the control of either party. The shipowner filed a petition for limitation of liability under 46 USCA § 183, in which the averments were made that the ship was seaworthy and struck some submerged object which caused it to sink. These averments were denied by the cargo owner, who put in a claim for $15,000, the value of the cargo; but the District Judge held that they were both sustained by the evidence, 27 F.(2d) 908, and accordingly entered a decree granting the limitation of liability prayed for by the petition. From that decree the cargo owner has taken this appeal.

The Rose Murphy was a steel ship with hull plating one-half to three-fourths inches thick and about 260 feet long, built in 1918, and classed A–1 in the American Bureau of Shipping. Just prior to entering upon the service required by the charter party here in question, the Rose Murphy was placed in dry dock, thoroughly inspected and the A–1 rating continued. It was mortgaged to secure $17,800, insured for $75,000, which the insurer had increased to $100,000 effective on December 1, 1927. Its value was not otherwise shown. The charter party provided for transportation of two cargoes of phosphate rock to Pinners Point. The first cargo was delivered, and it was while engaged in making the second trip that the loss occurred which is here in controversy. The ship sailed from South Boca Grande on November 25, 1927, with a competent crew, consisting of master, first, second, and third mates, chief engineer, first assistant and second assistant engineers, and nineteen seamen. The cargo consisted of 2,625 tons, and was not more than a fair load. The draft of the vessel was 17.5 feet forward and 18 feet aft. A point about 8 miles south of Sand Key Light was reached at 11:30 p. m. on the 26th. At that point, the master went off duty, after directing a course east one-half south for one hour, and then northeast. The second mate went off duty at midnight. There was testimony to the effect that at about 12:30 the chief engineer, who was also off duty, reported to the third mate, who was on duty, and also to the master and the second mate, that the ship had struck something, and that water was coming into the engineroom. At that time the second assistant engineer and an oiler were on duty

in the engineroom. They did not testify in the case, nor did the chief engineer, nor the first mate. The master testified that he was awakened by what appeared to be a shock, which at the time he thought was caused by a lurch of the ship in the sea. The second mate, who is a half-brother of the owner, testified that he was in his bunk, but had not gone to sleep, and that he heard or felt something, but did not think anything about it until he was called by the chief engineer. The third mate testified that while he was on top of the pilot house making a bearing on Sand Key Light, it seemed to him that at one time the ship only went halfway down in the sea. He admitted that he had stated before the local inspectors that he did not feel anything "to any extent." Several witnesses testified that the sea was rough, and they estimated that the wind was blowing at the rate of 45 miles per hour; but the record of the Weather Bureau at the Key West station shows that the highest velocity of the wind on the 26th was 20 miles per hour between 1 and 2 o'clock p. m., that it gradually decreased to 13 miles by 9 o'clock, to 12 miles at 11 o'clock, and did not rise above 12 miles per hour until 11 o'clock the next day. After the chief engineer reported that the ship was leaking, a general alarm was given, the ship's pumps were started up, and the two lifeboats were lowered. The first assistant engineer testified that he went down into the engineroom where he discovered that water was coming in under the port bunker about amidships, that he examined the sea cocks and found the valves closed on all pipes through which water could enter from the sea, that the pumps were working, but the in-coming water was gaining rapidly, and that he did not see any firemen in the boiler room.

The officers who testified stated that the whistle was sounded, rockets, and flares were sent up, that the ship was held on her course until the lifeboats were lowered, and was then headed toward the Florida Reefs, but made little, if any, headway on account of the fact that the steam in the boilers had died down, and that at about 2 o'clock in the morning they abandoned the ship, believing it would soon sink, and got into one of the lifeboats. They said that during the night they saw the lights of 10 or 15 ships, but that none of them came to their rescue. The officers in one lifeboat and the sailors in the other stood by until the ship finally sank at 6:24 on the morning of the 27th. The lifeboats were then sailed to Sand Key Light, and from there the crew were taken into Key West. Each lifeboat was capable of carrying 37 men. The one used by the sailors, upon being launched, was found to be taking water through the drain hole in the bottom by reason of the fact that the sea cock or stopper used to plug it, although on board, was not in place. After bailing out the water for a while one of the sailors found the stopper and plugged up the hole with it.

The story told by the sailors was to the general effect that the shock testified to by the officers was caused by reversing the engines, and that the ship was deliberately sunk by one or more of the officers. One of them went so far as to say that he overheard a conversation between the master and the chief engineer, in which the master indicated his intention to do away with the ship. It was the general consensus of opinion among the witnesses that there is such a marked difference between a shock caused by a collision and the jar produced by reversing the engines that the one can easily be distinguished from the other. It is true, nevertheless, that the sailors joined the officers in a protest which stated that the ship struck a submerged object. It appears from the opinion of the District Judge and from the evidence that the sailors filed claims and answers, which, however, were not included in the record on this appeal, by which they sought allowances in this proceeding for the expenses of being returned to their home port; and for the value of their clothing which the third mate would not allow them to place in the lifeboat, and which went down with the ship, or was thrown overboard. All the witnesses agreed that the hatches were blown off, indicating that the ship had become air bound and was thus kept afloat longer than otherwise it would have been, and that the ship went down about 8 miles almost due south of the entrance of the main ship channel to the harbor of Key West. According to the testimony of the second and third mates, who took the bearings on Sand Key Light, and as shown by the government chart, assuming their calculations to be approximately correct, the ship was in water at least 100 fathoms deep at the time it is claimed she struck a submerged object.

The testimony was all taken in the presence of the District Judge, and we accept the view disclosed by his opinion that the testimony of the seamen was untrue in so far as it contradicted that given by the offi-

cers. The cargo owner introduced an expert witness who advanced the theory that a ship of the type of the Rose Murphy could be caused to sink in about six hours by opening up a sea cock in the engine room, but his calculations were based upon the intake capacity of a pipe greater in diameter than that of any intake pipe of the Rose Murphy, and therefore are of no probative value.

We agree with the District Judge that there was satisfactory evidence to the effect that the Rose Murphy was seaworthy. It affirmatively appears that the vessel was placed in dry dock and was inspected by competent inspectors at Mobile preparatory to entering upon the charter party, that there was no lack of due diligence on the part of the owner, and that, after such inspection, the vessel sustained no injury up to the time it is claimed she struck some submerged object. But the burden was upon appellee to prove, not only seaworthiness, but also the other allegation of the petition that his ship was lost by a peril of the sea. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748. We are of opinion that the evidence submitted fails to sustain the conclusion that the ship struck a submerged object. According to the evidence and the government chart, the supposed accident occurred in water at least 100 fathoms in depth, and there is no suggestion that at this place there was any rock near the surface, or that the shock was as severe or the injury as great as would have been caused by the impact of a moving vessel against a rock. Moreover, it is claimed that there was only one shock about amidships. It does not appear to be reasonable that the ship would have struck a fixed object once amidships and then clear it altogether while the draft remained the same or became slightly deeper. If a rock had been encountered, it would seem to be highly probable that a hole would have been torn in the bottom of the ship, and that she would have been sunk in much less time than is indicated by the evidence. It is suggested by appellee's counsel that the ship struck a submerged derelict, but it is not explained why it did not strike more than once, or only amidships. No wreckage was seen by any of the crew, and it was not shown that any wreckage or derelict was in the vicinity. The depth of water was such as to make it certain that the ship did not strike any wreckage resting on the bottom. It is stated as a scientific fact in the Encyclopedia Britannica (11th Ed.) vol. 14, p. 119, that the weight of a floating body "must be less than the weight of the total volume of liquid it can displace; or else the body will sink to the bottom of the liquid;" and, in a bulletin issued by the Treasury Department dated April 20, 1923, entitled "Derelict Destruction," it is said:

"The hydrostatic principle that anything that will sink beneath the surface will go to the bottom is not generally known. This fact accounts for many reports of 'spars apparently attached to submerged wreckage' in deep water. It is conceivable that the specific gravity of a piece of submerged wreckage might be so nearly equal to that of water that the buoyancy of a spar would support the wreckage, but there is no record of such a case having been encountered, and little probability that one ever will be."

In "The Outline of Science," by J. Arthur Thomson, professor of Natural History at the University of Aberdeen, it is said (volume 4, p. 965):

"There is no warrant at all for the common sailor's belief that ships and men sink till they 'reach their level' and there remain suspended. Everything sinks to the bottom."

The Norge (D. C.) 156 F. 845, and The Mahanoy (C. C. A.) 273 F. 668, cited by appellee, are not in conflict with this view. In the first case it appeared that the vessel was near submerged rocks, and immediately after striking wreckage was observed. The court concluded that the vessel struck a derelict or some unknown rock. For all that appears, there might have been a wrecked vessel resting upon a rock. In the other case, the submerged object which was struck was a vessel which went down by the head to the bottom in water only 30 feet deep, leaving her stern a few feet below the surface.

Assuming, however, the possibility that there was some object which was capable of sinking a steel ship 17 feet below the surface, the testimony relied on to support the inference that it was struck by the Rose Murphy is in our opinion so unsatisfactory and speculative that it cannot reasonably be said to have any probative value. Not one of the officers who testified was positive that the ship struck any object. The master and the third mate thought at the time that there was nothing more than the commonplace action of the waves, and the second mate thought he heard or felt something, but said that he paid no attention to it. No one of these witnesses was aware that anything

out of the ordinary had occurred until, as they say, they were told by the chief engineer that there had been a collision of some kind. It is hardly possible that an impact sufficient to loosen the steel plates would not have made a distinct, original impression, at least upon the mind of the third mate who was awake and on duty. Neither the second assistant engineer nor the oiler who were in the engineroom, and in immediate proximity to the point where it was supposed the ship struck, testified in the case. They were in a better position than any of the officers who did testify to give testimony that did not need the aid of suggestion. It is suggested that, if there had been a preconcerted plan to sink the ship, the precaution would have been taken to see that the lifeboat which the sailors used would have been protected against the entry of sea water through the hole in the bottom. We do not think that circumstance is of any importance. No doubt the stopper was removed so as to drain rainwater that might gather while the lifeboat was in place on deck. He would be a dull sailor who would not know enough to stop up the hole, even after the lifeboat was launched. The circumstance that within two or three days increased insurance on the ship would be effective is without special significance. The argument could be made that the additional insurance was taken out for the purpose of warding off suspicion with as much show of reason as there is in support of the argument which is advanced that, if the owner intended to cast away his ship, he would at least have waited until such insurance became effective. A stronger circumstance in favor of appellee is that he might have made fair weather with the sailors by furnishing them transportation to Mobile and paying them for their clothing. We do not mean to say that the evidence warrants the conclusion that the ship was cast away with the connivance of its owner, or even that its officers deliberately sank it. It therefore is unnecessary to consider the failure of appellee to prove the value of the ship; or the circumstance that it went down near a place of safety; or its early abandonment by the crew. What we do say is that, in our opinion, the explanation of the loss is not satisfactory, and consequently that appellee has not sustained the burden of proof that was upon him.

The decree is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.