## LOUIS-DREYFUS et al. v. PATERSON STEAMSHIPS, Limited.

District Court, W. D. New York. October 25, 1929.

Bigham, Englar, Jones & Houston, of New York City, and Burke & Desmond, of Buffalo, N. Y. (Henry N. Longley, of New York City, and Thomas C. Burke, of Buffalo, N. Y., of counsel), for libelants.

Holding, Duncan & Leckie, of Cleveland, Ohio (Frederick L. Leckie and Theodore C. Robinson, both of Cleveland, Ohio, of counsel), for respondent.

ADLER, District Judge. This case arises out of damage to a cargo of grain caused by the sinking of the steamer Advance on November 3, 1927, near the entrance to the Cornwall canal, St. Lawrence river. The libelant is a dealer in grain, and the Paterson Steamships, Limited, the respondent, operates ships on the Great Lakes. In August, 1927, the libelant, through Hall Shipping Company, arranged for the shipment of 306,000 bushels of wheat to be carried from Duluth, Minn., to Montreal, Canada. 241,000 bushels were loaded on the ship Canadoc, owned by the respondent, and 65,000 bushels were loaded on the ship Soodoc, owned by the respondent. Bills of lading were issued at Duluth, covering these shipments, and specifying that they were bound for "Montreal with trans-shipment at Port Colborne, Ontario." The ships carrying the grain proceeded to Port Colborne, where it was unloaded into elevators and reloaded on smaller ships to be carried through the Welland canal, Lake Ontario, and the St. Lawrence canals to Montreal.

The ships in which the grain was originally loaded are too large to make the trip through the canals. When the cargoes were broken up at Port Colborne, it required six ships to take the grain the rest of the way down to Montreal. Four of these smaller ships belonged to Paterson Steamships, Limited, the respondent. They apparently reached Montreal safely and delivered the grain on them in good condition. Of the two smaller ships which did not belong to respondent, one of them, the Hanna, carried 15,583 bushels of grain, and that apparently reached Montreal safely and delivered its cargo in good condition. The remaining ship, the Advance, which did not belong to respondent, apparently struck some obstruction when approaching the Cornwall canal, a hole was stove in the side of the ship, it filled with water, and sank. It was raised and taken to drydock. All of the grain was damaged, and was subsequently disposed of.

The respondent states that its liability ceased on the delivery of the grain from its ships to the elevator at Port Colborne. It calls attention to the fact that the bills of lading provided for the transshipment at Port Colborne. There is also in evidence a letter from the Hall Shipping Company, the brokers, to the libelant confirming the charter from Duluth to Montreal with these words in parenthesis: "Ship's option direct or via Port Colborne, Ontario." And on the back of the letter of confirmation appears this language: "Grain chartered to Montreal is ship's option direct to Montreal or via Port McNicoll, Tiffin or Port Colborne, Ontario." What happened was that, when the ships got to Port Colborne, the agents or representatives of Hall Shipping Company took charge of the transfer of the grain to the smaller vessels. The shipments on the Hanna and the Advance, the two ships not owned by the respondent, were arranged for by these

agents. It is the contention of the respondent that in making those arrangements for the shipment on the Advance the agents acted for and in behalf of libelant and not for the respondent, the Paterson Steamships, Limited, that Paterson Steamships' responsibility ceased when it discharged the cargoes at Port Colborne, and that the Advance, the boat that sank, was chartered by libelant's agent.

The bills of lading show a single contract of carriage from Duluth to Montreal, with the privilege of breaking bulk at Port Colborne or some other point. The respondent was in the business of carrying cargoes between these ports in their own ships. They had large ships for use in the upper lakes and smaller ships which could be used for navigating the canals from Lake Erie to Montreal. It is clear that the grain in this case was loaded on the larger ships for carriage from Duluth to Port Colborne on account of economy of transportation. It was not necessary to deliver the grain to a different carrier in order to complete the voyage to Montreal. In fact, the greatest part of the grain was carried from Port Colborne to Montreal in respondent's own ships. For these reasons, Myrick v. Michigan Central R. R. Co., 107 U. S. 102, 1 S. Ct. 425, 27 L. Ed. 325, Pennsylvania R. R. Co. v. Jones, 155 U. S. 333, 15 S. Ct. 136, 39 L. Ed. 176, and other cases cited by respondent on the point that respondent was only the initial carrier, do not apply.

In my opinion, the contract with the respondent was for the carrying of the grain all the way through from Duluth to Montreal.

The sinking of the Advance, resulting in the damage to the grain, was caused by a hole being punched in the ship on its port side about 50 feet from the stern. The ship filled with water, and sank in a very short time. It is not known just what the ship ran against to produce the injury. Examination of the testimony leaves no doubt that the sinking was the immediate result of the hole made in the ship's side at this time.

It is claimed by the libelant that the Advance was unseaworthy. It is an old ship. It has an iron frame covered with planks. There is no evidence that the iron frame had in any material way deteriorated. There

is some evidence that the planks had been worn down in many places, and were in some places considerably gouged. It is contended that they were not strong enough to sustain the ordinary perils of navigation. The ship had been duly examined, and had been given a rating which permitted it to carry grain. It is claimed that the examination was not a thorough one, because the planks had been sounded while the ship was in the water and not while in drydock. After the sinking, however, and when the ship had been placed in drydock, the planking at the point where the hole had been stove in was replaced, and, after examination by the proper authorities, it was again given a rating which would permit it to carry grain. Just previous to this voyage, the Advance had made three successful voyages carrying grain. Prior to the accident, the testimony is that the ship was not leaking unduly. These facts, together with all the other testimony, indicate to me that the ship was seaworthy. In re Gravel Products Corporation (C. C. A. 2d Circuit) 24 F. (2d) 702.

There remains the question of whether the sinking was the result of a peril of navigation for which the ship, the owner, or the charterer are not responsible. The ship was plying between two Canadian ports. In that case the provisions of the Harter Act (46 USCA §§ 190–195) probably do not apply. The Water-Carriage of Goods Act of Canada has provisions similar to the Harter Act, and in section 7 provides as follows: "The ship, owner, charterer, agent or master shall not be held liable for loss arising from fire and dangers of the sea or other navigable waters." The bill of lading, referred to as a nonnegotiable memorandum, issued to the Advance contains this language: "The act of God, the King's enemies, fire and all and every dangers and accidents of the seas, rivers and navigation of whatsoever nature and kind excepted." This language incorporates generally the provisions of the Water-Carriage of Goods Act of Canada. Under this law, and with this provision in the bill of lading, the respondent is not liable for the damage resulting from a peril of the sea or an accident of river navigation. I am of the opinion that the accident to the Advance was such an accident.

The libel is dismissed.