## THE CALVERT.

### EASTERN TRANSP. CO. v. INSLEY.

### No. 3118.

Circuit Court of Appeals, Fourth Circuit.

June 19, 1931.

L. Vernon Miller and George Weems Williams, both of Baltimore, Md. (Marbury, Gosnell & Williams, of Baltimore, Md., on the brief), for appellant.

Henry L. Wortche and George Forbes, both of Baltimore, Md., for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

GLENN, District Judge.

This is an appeal from a final decree of the District Court of the United States for the District of Maryland, in admiralty, entered January 14th, 1930.

This decree denied the petition of the appellant for limitation of liability as owner of a certain barge Calvert, and awarded damages to the appellee, Mary M. Insley, administratrix of the estate of Everett C. Insley, who was the master of the barge.

The barge had foundered in the Chesapeake Bay in the early morning of May 17, 1928, and in the disaster the master, his wife and three children were drowned. As the immediate dependents of Captain Insley perished along with him, his mother properly qualified as administratrix of his estate and prosecuted this action. While, of course, Insley's own family were his chief dependents, the evidence does show that his mother was dependent on him to a certain extent.

An action was started in the Maryland court by the claimant here, and this was followed by a petition of the Eastern Transportation Company, a corporation, for limitation of liability as owner of the barge Calvert. This petition was brought under terms of 46 USCA §§ 183, 184 and 185, Revised Statutes, §§ 4283, 4284, and 4285. The District Court heard the evidence which covered a wide range, and in which there were numerous controverted questions of fact. The court wrote a full opinion dealing with all of the questions of fact and propositions of law involved. This opinion is published in 37 F.(2d) at page 355, 1930 A. M. C. 258. The decision of the court as there reported in full may be summarized in the following findings: (1) That the barge Calvert was unseaworthy at the time of her departure from Sparrow's Point, Md.; (2) that the unseaworthiness of the barge was the proximate cause of the foundering; (3) that the unseaworthiness was therefore the proximate cause of the death of the appellee's intestate; (4) that her unseaworthiness was due to such negligence on the part of managing officials of the appellant company as to preclude it from availing itself of the defense of limitation of liability on the ground of lack of privity of knowledge; (5) that the appellee's intestate had not assumed the risk arising from the defect of the character disclosed in the present case; (6) that the appellee, mother of Everett C. Insley, deceased, was dependent upon him to a certain extent, and assessed the damage at $7,000.

The appellant has appealed from this decision, as outlined in the opinion and made effective in the resulting decrees, taking issue with practically every phase of the decision. It has been stated time without number that on an appeal in admiralty the findings of fact of the trial court based on conflicting evidence will not be disturbed on appeal, unless it is shown that such findings are clearly without support in the testimony. The rule is stated by this court in three cases.

In the case of Chesapeake Lighterage & Towing Co., Inc. v. Baltimore Copper Smelting & Rolling Co., 40 F.(2d) 394, at page 395, 1930 A. M. C. 804, this court said: "It has been long settled in this court that the finding of the District Court having support in the evidence will not be reversed unless we reach the conclusion that that finding is clearly wrong."

In the case of Malston Co. v. Atlantic Transport Co. et al., 37 F.(2d) 570, this

court, in a per curiam opinion, at page 571, said: "The trial judge saw the witnesses and heard them testify, and, in addition to this, is familiar with the location where the collision occurred. In such case it is well settled that we would not be justified in reversing his findings unless we are prepared to say that they are clearly wrong, which, under the record here, we certainly could not do. His findings are supported by evidence, and, while there is some evidence to the contrary, it is not such as would justify a reversal."

And in Lewis v. Jones, 27 F.(2d) 72, at page 74, this court said: "On the second question, it is unnecessary to cite authority to sustain the proposition that the finding of the trial judge, who had the opportunity of seeing the witnesses, hearing their story, judging their appearance, manner, and credibility, on the question of fact, is entitled to great weight, and will not be set aside unless clearly wrong."

■ These rules are particularly appropriate to the case at bar. During the trial, there were many witnesses who testified on every phase of the case. The history of the barge was thoroughly covered in testimony. The transactions immediately surrounding the disaster were covered by the testimony of the captain of the tug Denhardt, which was towing the barge at the time, and by that of his mate and the crew of the barge McDonald, which barge was in the same tow. The mate of the Calvert, who was on duty at the time of the disaster and who alone of the crew survived, testified. There was full testimony from the diver who helped raise the Calvert. There were the usual surveyors and experts expressing opinions. There were many side issues gone into which reflected on the interest, bias, and accuracy of several of the witnesses. The petitioning company did not call their own surveyor, but he was produced by the claimant, and his conclusions are not in complete accord with the facts to which he testified. The record shows that considerable feeling was developed during the trial, and that there was much necessity for the trial judge to determine the credibility of the witnesses. He was in position to do this much better than is this court. We agree generally with the conclusions of the trial judge on the questions of fact which were made the basis of his decision. While we think it would be unnecessary to repeat his digest of the testimony, we think that we should point out the circumstances under which the Calvert sank.

The barge Calvert, which belonged to the defendant company and had been in service for a number of years, was loaded with seven hundred and fifty long tons of crushed slag. The cargo was to be transported to Urbana, Va. The intended voyage, therefore, involved a trip down the Chesapeake Bay, which was a customary trip for this barge. She was in charge of Insley, who, with the tacit permission of the company and in accord with the common practice, had his family on board. The only other person on board the Calvert was the mate, Brock. Brock survived the disaster and testified before the court. During the evening of May 16, 1928, the Calvert was taken in tow by the tug, Denhardt, along with another barge, the B. W. McDonald; all three of the vessels being owned and operated by the defendant company. The tow was made up in the order of the tug Denhardt, the Calvert, and the McDonald, which was light. The Calvert followed the tug at a distance of one hundred and twenty-five fathoms, and the McDonald followed the Calvert at a distance of fifty-five fathoms. It is undenied that the weather was mild and cloudy with a moderate southeast wind and no sea worth speaking of. The testimony of the captain of the tug and of the master of the stern barge McDonald is that everything went along well until midnight. The mate of the tug testified that as late as one o'clock all three vessels were in satisfactory condition, and the tow was proceeding satisfactorily down the bay. The first indication of any trouble about which any survivor could testify with accuracy is given in the testimony of the mate of the tug. He testified that about one o'clock he noticed that the tug's engine had slowed down slightly, which he, at the time, attributed to a drop in the steam pressure; but which subsequent events show to have been caused by the extra pull required to tow the sinking Calvert. The District Court found as a fact, and we concur therein, that the hawser did not slip off of the bit on the Calvert until she was well under water. The mate of the tug, a few minutes later, heard a cry in the rear of the boat. Upon going outside he discovered that the Calvert was missing and that someone was in the water slightly to his rear. He immediately reversed the tug and began search for the Calvert. The captain, being awakened in the meantime, took charge of the situation and they instituted a thorough search for the Calvert and her crew. Brock, the sole survivor, was picked up out of the water and did

not give a very satisfactory account of what had happened. Although the captain and his mate as well as the crew of the McDonald searched for hours, they were never able to find any trace of the Calvert or of the Insley family. In the meantime, a large vessel came up the bay and assisted in the search with the use of her lights.

The diver testified fully as to the condition in which he found the Calvert on the bottom and as to the method used by him in passing the cables underneath the body of the Calvert so as to raise her. When she was towed in and put on the ways she was examined thoroughly by surveyors, and the District Court had the benefit of their testimony and opinions. In the light of all the opinions and the available findings of fact, several suggestions were made as to the way in which the Calvert sank and what caused her to sink.

The claimant relied upon the explanation of a general unseaworthiness due to the rotten condition of the bottom—with many small leaks. The owner, Transportation Company, stressed the importance of a scar which was found on the side of the barge when she was put on the ways. The contention was that this scar was sufficient to cause a sudden sinking, and that its course showed that the barge had struck some submerged object and then passed over it. It was pointed out that the striking of submerged objects is not an infrequent occurrence in navigation, that the insurance records and law books contain many such cases. It is further pointed out that this view is consistent with the failure of the diver to find any object immediately under the Calvert when he went down to raise her. The importance of the scar was urged upon the court with great earnestness as being the proximate cause of the disaster, and as negativing the explanation that the cause was the general unseaworthy condition of the barge.

The District Court dismissed, and we do also, the explanation that she struck some object floating beneath the surface. Experience as revealed in testimony and reported decisions, as well as the well-established laws of physics, are against the logic of any such conclusion. The District Court found on the evidence that her unseaworthy condition was the real cause of the foundering.

The sudden foundering of the barge, as explained in the opinion, is not at all inconsistent with the proposition that she was unseaworthy by reason of a number of slow leaks and one particularly bad place in her side. It occurs to this court also that the foundering may not have been so very sudden. We have already referred to our opinion that Brock, who was the only man supposed to be awake on the Calvert, was in all probability asleep; and his meager testimony is doubtless explained by the fact that the first he knew of the sinking was when the water was actually up around his body. The parties to this suit had considerable trouble locating Brock and producing him as a witness. The testimony with reference to his movements and his conduct generally leads us to believe that he was probably an irresponsible person; and we cannot help but feel that he was in all probability asleep when the Calvert began to founder. Certainly, if he had been wide awake, he should have been able to have given a more logical and reasonable account of the disaster than is found in his testimony. Since the master and his family are dead and Brock's testimony, even if true in every respect, is very meager, the District Court was forced to rely upon inferences from other testimony as to exactly how the Calvert sank. In fine we agree with the District Court in its finding of fact that the disaster was due to the unseaworthy condition of the barge at the time she set out upon this voyage. He sums up his full discussion of the testimony and very logical reasoning thereon as follows:

"Therefore it may fairly be said of Mitchell's testimony on this point that it was an attempt 'to soften' the story that his survey told, and that he was in error as to the probable length of time a vessel in such condition could remain afloat. The fact remains that she did sink, and all of the evidence bears out the conclusion that it must have been caused by a combination of the various defects in her seams and planking (after all due allowance is made for the added damage caused to her seams and planking, due to warping and straining while being raised), permitting the ingress of water slowly, but constantly, until her buoyancy was suddenly lost and she sank. Mitchell testified that he found a lot of decayed material in the Calvert. She was twenty-eight years old, and, while she was rebuilt in 1923, she had not been drydocked for a year and a half, and there is no evidence that any repairs had been made upon her following a stormy voyage which she had taken the previous April. Furthermore, only a comparatively small amount of repairs had been made during the previous 15 months, and there is no evidence

of any surveys having been made, which would have shown her exact condition prior to the disaster.

"All of these circumstances lead to the inevitable conclusion that the gradual intake of water, for how long will never be known, but for at least a considerable time prior to her actual foundering, was the cause of her going down; and the fact that her gradual settling, which must have taken place before the final sinking, was not noticed by her mate, is not unnatural, because of her character and size and that of her cargo, and the fact that she started out with very little freeboard. A fortiori no weight is to be given to the fact that those on the other barge and the tug detected no settling, because of the distance that they were separated from the Calvert.

"The weight of the evidence leads fairly to the conclusion of unseaworthiness. The unusual character of the disaster, its suddenness, and the fact that it has forever sealed the lips of those who presumably could best explain the cause, invite speculation. It is easy to assert that the cause is beyond explanation, but a complete analysis of the evidence does not reasonably permit us to do so."

This conclusion, while of course depending upon the facts of this particular case, finds support in the decisions by other courts in similar cases. We quote from Oregon Round Lumber Co. v. Portland Lumber Co. (D. C.) 162 F. 912, 920 where Judge Wolverton says: " * * * It not infrequently transpires that a vessel, after entering upon her voyage or engaging in the service for which she is dispatched, becomes unseaworthy, and damage ensues, without any apparent cause from stress of weather or collision in any way, or undue or negligent abuse in handling and navigating her, and in every such case the presumption obtains that she was unseaworthy at the time of entering upon her service. How else could her condition be accounted for? In the case of The Arctic Bird (D. C.) 109 F. 167, the barge, the subject of libel, was taken in tow, having cargo on board, and, having proceeded for six hours on her voyage, sank without receiving injury from any known source, and without encountering strong wind or rough sea. The court held it was to be presumed that the barge was unseaworthy at the outset; otherwise, there was no cause or way to account for her action in failing to perform the functions for which she was dispatched.

The court quotes, as authoritative, from Dupont de Nemours v. Vance, 19 How. 162, 15 L. Ed. 584, as follows: 'As to what constitutes seaworthiness, it has been uniformly held that if a vessel springs a leak, and founders, soon after starting upon her voyage, without having encountered any storm or other peril to which the leak can be attributed, the presumption is that she was unseaworthy when she sailed.' And also from Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012: 'If a defect without any apparent cause be developed, it is to be presumed it existed when the service began.' "

Adopting the view, therefore, that the sinking of the barge was due to her unseaworthy condition at the beginning of the voyage, which after all was only three or four hours before the disaster occurred, we pass next to the right of the appellant to limit its liability. We also think that the District Court decided this matter correctly.

The testimony is that the responsible officials who were charged with the inspection of the barges belonging to the defendant company had adopted a very loose and careless practice of making this inspection. They seemed to have relied chiefly upon remedying small defects which were called to their attention by the bargemen. They admitted that there were no annual or semi-annual inspections. The testimony was that this particular barge had on a trip shortly previous been carrying fertilizer, and that at the end of the voyage this fertilizer was damaged. All of the men who had handled the Calvert agreed that they were forced to use pumps almost constantly to keep her afloat. If the inspecting officers did not know of the very bad condition in which the Calvert was before entering upon this trip, such ignorance was due to negligence in making their inspections, or in not making them at all. We agree with the District Court in its findings that the defendant company here is not entitled to limit its liability. It has not sustained the burden which the statute casts upon it before it can claim the benefit of this limitation.

■ With reference to the assumption of risk, it is clear from statute and decision that it applies in admiralty. Its particular application rests in this case upon the proposition that no one was in better position to know of the unseaworthy condition of the barge than Insley himself. But as pointed out in the opinion of the District Court, under the terms of the Merchant Marine Act of

1920, the act of the seaman in assuming the risk must have been voluntary and not under restraint. It would be an extremely harsh application of this rule and one which we believe has never been invoked by a court of admiralty, to hold that a master of a vessel assumed the risk of the unseaworthiness of a vessel by continuing in the employ of a company whose duty it was to see that the vessel was seaworthy. Furthermore, the nature of the defects in this particular case were such that a mere bargeman, as Insley was, would be slow to ascertain and appreciate. They could have been easily determined by the company and its inspectors, if the vessel had been hauled out and examined thoroughly. We have never understood that the mere knowledge on the part of a bargeman that a vessel was leaking somewhat and his continued employment with this knowledge makes out the defense of assumption of risk against damage due to a general unseaworthy condition. Assumption of risk involves the ready and willing acceptance of risks which are known and thoroughly appreciated. The maxim is "volenti non fit injuria," not merely, "scienti non fit injuria." The decision of the District Court on the assumption of risk feature of the case is based on logical interpretation of the facts of this case, and the law as stated in the cases cited in the opinion. There is no need here to repeat discussion or citation.

We cannot escape the conclusion, however, that the award of $7,000 was excessive under the proof. If Insley alone had perished, and the suit were brought by the widow for the benefit of herself and minor children, the proof of dependency would have been much stronger and the recovery much larger.

As is well said in regard to this type of case: "Inasmuch as the deceased were (with two or three exceptions) of age, the relationship carries, as a rule, no legal obligation of support. * * * Where parents are claimants, therefore, regard must be had solely to actual contribution. Occasional gifts will not form the basis for pecuniary loss, unless they are sufficient to indicate a consistent purpose to contribute. Moreover, the continuity of contributions to parents can hardly be regarded with the same assurance as support of wife and children. It must also be borne in mind that the shorter expectancy of life of the parents prevails." The City of Rome (D. C.) 48 F.(2d) 333, 338, 1930 A. M. C. 1841.

Brushing aside the feeling of sympathy and horror which we naturally have in contemplation of a disaster which caused the simultaneous death of a man, his wife, and three small children, and getting down to the actual proof of dependence on the part of the mother, we feel compelled to reduce the amount of the recovery.

The testimony shows that Insley, devoting the larger part of his income to his own wife and children, did not actually contribute very much to the support of his mother. She had other sons who were helping to bear her expenses. The testimony actually shows that he had contributed about twenty dollars a month to his mother's support for a period of a year and a half. It also shows that all along over long periods he had contributed practically nothing to her support. We must consider also that as part of the consideration of the $20 a month payment, and the irregular contributions towards rent, coal, and provisions, that she was supplying a common home for her children and their families, and it is reasonable to assume that the contributions towards provisions and the like were made at irregular intervals and at such times as the deceased and his family shared the common home. Neither does the District Court in arriving at the amount of $7,000 seem to have taken into consideration the earning power of money during the 20.20 years of admitted expectancy on the part of the mother. Taking everything into consideration, we think that the recovery should be fixed at $4,000.

The effect of this opinion is, therefore, to adopt the findings of fact, conclusions of law, and the decision as made by the District Court on all features of the case, except that of the amount of recovery.

The amount of the recovery is fixed at $4,000. With this one modification, the decree of the District Court is hereby affirmed.

Affirmed with modification.