THE CHEHAW.

In re SEXTON.

ROCKMORE v. BUCK et al.

THE BARRENFORK.

UNITED STATES INDUSTRIAL ALCOHOL CO. v. MARINE CONTRACTING & TOWING CORPORATION.

District Court, S. D. New York.
Oct. 9, 1931.

Foley & Martin, of New York City (J. A. Martin and John R. Stewart, both of New York City, of counsel), for the Barrenfork.

Single & Hill, of New York City (T. H. Middleton, of New York City, of counsel), for United States Industrial Alcohol Co.

George B. Warburton, of New York City, for respondents E. A. Buck and others.

WOOLSEY, District Judge.

My decision in these cases is as follows:

In the petition of Emory Sexton for exoneration from or limitation of liability for damage to the cargo of potash on the Chehaw, there is liability on the part of the Chehaw, and consequently, on the part of her owner, for the damage suffered by said cargo; but, on the other hand, the petitioner is entitled to limit his liability.

I will mention next the case of Max Rockmore, as trustee in the limitation proceeding against E. A. Buck et al., as charterers, for demurrage. That case is really ancillary to the limitation proceeding, and can appropriately be dealt with by the same commissioner as in the limitation proceeding, because the court is asked in this case of the trustee to fix finally the amount of the fund available in the limitation proceeding.

Now, I will put the decision thereof in this way. I think that the commissioner will have to determine the amount of demurrage, if any, which is due, but that he cannot take into consideration the time lost at Charleston while the vessel was in a port of distress—part of the time under arrest—and must concern himself only with the ports of loading and discharge named in the charter party.

In the third case of the United States Industrial Alcohol against the Marine Contracting Company, as owner of the Barrenfork, I will dismiss the libel with costs.

I. The pattern of these cases, which really involves several aspects of one controversy, works out as rather simple.

We have had a trial that has lasted almost a week, during which I have taken very careful notes and have considered the authorities which were submitted to me.

The story of the cases, so far as is really material, is that the tug Barrenfork, after taking the Chehaw and her sister barge Darien and two other barges from Baltimore, where the Chehaw and Darien had been loaded, down the Chesapeake, left the Chehaw and the Darien in Lynnhaven Bay, inside of Cape Henry, and took the other two barges

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for Sexton and Rockmore.

to Norfolk, where one was left at Lambert's Point and one at Sewall's Point, and then returned in the latter part of the morning of October 21, 1929, to the Chehaw and the Darien.

Whilst at Norfolk the master of the tug had had his mate telephone to the weather station in Cape Henry, and had been advised that there would be moderate southerly winds, and he so reported to the captain.

It appears, however, that shortly after that telephone conversation further weather reports had come from Washington, and the records show that there was a southeast storm signal flying both on Old Point Comfort station when the Barrenfork passed on her way back to the Chehaw and the Darien, and also that after she had picked them up and passed out to sea similar warning signals were flying from the weather station at Cape Henry.

After the Barrenfork got out to sea, she encountered weather which, whilst it was rough, I find was not of such catastrophic nature as fairly to be entitled to be considered as excusing a damage suffered by a barge if she were seaworthy.

II. The testimony from the barge Chehaw is that she commenced to leak about 12 o'clock midnight on October 21st, and further that she did not then, or on the next day, advise the tug that she was leaking. At the time the leak was discovered the position of the vessels was slightly below Currituck, and up to that time the speed of the tug had been maintained at about the same rate as she had made in Chesapeake Bay, namely, about five miles an hour, which is cogent evidence that the weather was not extraordinary.

About this time the tug slowed down somewhat so as not to take her tow too strongly into the sea, which was then rising.

The next day, October 22d, the Barrenfork turned around at about 10 a. m., with the feeling, which I believe was candidly stated, that, while the weather was not too bad at the time, it looked as if it might get worse, and the captain of the Barrenfork thought he ought to get back nearer Cape Henry in order to be able to go in there in the event it became advisable to do so. He went northward to a point about opposite False Cape, which he reached at 7:30 p. m. on October 22d. The weather came on better then, and he then turned and continued his voyage southward.

Up to that time there had not been any communication whatever to the tug from either of the barges. It was not until 9 a.

m. on October 23d that the Chehaw signalled to the tug that she was leaking.

III. Then the tug fell back and the captain had a talk with the master of the Chehaw. After this conference it was decided to go to Cape Lookout Bight, back of Cape Lookout, which was slightly nearer than Cape Henry. The alternative presented was whether to go to Cape Lookout or Cape Henry, because they were the only two places of refuge available to vessels of the size of the Barrenfork and her barges. The flotilla arrived at Lookout about noon on October 24th.

An attempt was made there to pump the Chehaw out, but it was found that her pump and suctions were clogged and that her boiler tubes were so dirty as to make it difficult to keep up steam.

This situation was remedied somewhat, and on the 27th of October she proceeded on to Charleston after the lumber ports in her bows where the leaks had occurred had been caulked by members of the tug's crew.

The Chehaw did not leave Lookout, which was her first port of refuge, until after her leaving had been approved by a representative of the cargo insurers, and on her arrival at Charleston part of her cargo, which was not in good enough condition to go forward, was discharged.

IV. At Charleston there was an arrest of the cargo in some dispute, which I do not think is relevant here. It also seems to me in connection with the trustee's claim for demurrage that the delay at Charleston, whether due to the arrest or due to the removal of cargo or any other cause, cannot properly be included in the demurrage claim.

I understand that the freight claim made by the trustee has been paid, and that the only questions remaining to be determined are (1) whether there is any demurrage under the charter party of the barge made September 9, 1929, between its owners and H. J. Baker & Bros., and (2) if there is any demurrage, whether such demurrage is due from H. J. Baker & Bro. or from the United States Industrial Alcohol Company as undisclosed principal of H. J. Baker & Bro.

I will leave this question to the commissioner who will be appointed to assess the damages.

V. The above statement is a sufficient outline, I think, of the voyage, and now we will return to the afternoon of the 21st, just after the vessels had come out of Cape Henry.

Whilst, of course, the witnesses for the barge Chehaw exaggerated the weather, the witnesses for the tug minimized it as much as possible.

■ I do not think, having read the weather reports from the various stations along the coast, and having heard the evidence of Mr. Scarr, the weather forecaster here, that this storm was a storm of very unusual severity; but, of course, any tug which pits its own experience against the accumulated experience of other men and goes to sea in face of storm signals does so at its own risk. But it may be exonerated by the event.

If for example it had turned out that there had not been any storm, it is probable, owing to the condition of the Chehaw, that the damage would have occurred, but there certainly would not have been any valid claim against the tug therefor.

VI. The way the case lies in my mind is this:

■ I think that one has to consider what was the proximate cause of the damage to the cargo which is the subject-matter of this case. The proximate cause of that damage was, I find, the fact that the lumber ports in the bow of the Chehaw were not tight, and that, consequently, the Chehaw was not seaworthy.

I find that the weather was not sufficient to account for the leak which developed, and I am confirmed almost to the point of demonstration in this finding, because her sister barge, the Darien, of exactly the same construction, having the same sort of lumber ports, and the same sort of cargo in substantially the same amount, encountered without any difficulty the same seas, in tow of the same tug at the same time.

The only difference between the positions of the two vessels is that the Chehaw was the first of the barges in the tow and the Darien was the second. The petitioner's counsel in his very earnest and excellent argument has pressed the point that this fact would make a serious difference in the strain which the Chehaw would feel. I do not think, however, that it would make any difference whatever in the strain, so far as any effect on the lumber ports in her bow would be concerned. Indeed, one of the witnesses agreed with me that it would not affect any "panting" tendency in her bow.

Consequently, inasmuch as I feel that the proximate cause of this damage was the unseaworthiness of the Chehaw, I hold that the tug Barrenfork is not liable for the damage to the cargo.

■ It must be remembered, however, that the relation between the barge Chehaw and her cargo was that of bailor and bailee because she was a private carrier, and was wholly given to the particular cargo here involved. She was, therefore, not subject to the ordinary common carrier rule, and would be liable only for negligence.

■ Now, she produces her charter party, which was put in evidence, and invokes certain clauses thereof which she claims to be defenses to any liability on her part.

The first clause which she invokes reads: "Cargo to be stowed on vessel's skin at shipper's risk." I hold that this clause does not avail her because I do not think the view that the damage was due to the stowage of the cargo on the vessel's skin is sound, and hold that it was due to the unseaworthiness of her lumber ports; and, if that be so, the cargo would have been damaged practically as much as it actually was damaged whether stowed on the skin or not.

Counsel for petitioner also invoked the exception of "dangers and accidents of the seas and rivers and navigation of whatever nature and kind soever during said voyage." As I have already indicated, I find that this is not a case of damage due to sea perils.

■ Counsel for the owner of the barge goes further. In a clause which incorporates the Harter Act (46 USCA §§ 190–195), he calls my attention to the fact that there is an additional provision regarding seaworthiness, which says that "seaworthiness is warranted only so far as ordinary care can provide and owners are not liable for loss, detention or damage arising from latent defects arising at the time of sailing."

The lumber ports are openings in the bow of the barge which are used when long pieces of lumber are put on board. They have to be closed, caulked after use, and generally cement is put outside of the caulking.

This procedure is a question of operation during the voyage, and, indeed, caulking is usually done by the master and members of the crew of the barge. I am not satisfied that they used what could properly be described as ordinary care in caulking these ports on this occasion. I hold that they did not do so. In fact, I am not at all certain that the ports were actually caulked at Baltimore, but I do not feel that I need to go further in a finding on that question.

Certainly when this clause is read in connection with the first clause in the charter party, that the vessel shall be "tight, staunch,

strong and in every way fitted for" the voyage, one realizes that the burden was left on the owner of the barge to prepare her, and that, therefore, he must satisfy the trier of the facts that he did use ordinary care and also the due diligence required by the Harter Act here embodied. I am not satisfied that the shipowner, through his master, did use due diligence or even ordinary care to make the Chehaw seaworthy, and, consequently, the exception invoked will not avail him.

VII. There are one or two other matters which I should mention. One of them is the claim that the tug should have had a radio. Whether or not coastwise tugs should have radio receiving sets in order to enable them to get weather broadcasts is a matter which, I believe, has been argued already in one or two cases pending, and I do not know whether they have yet been decided. But I do not decide whether, owing to the growth of the art of communication and the constant broadcasting of weather by the government, it should be held that a radio, though not required by statute on a tug, should be part of the necessary equipment for a coastwise tug at the present time.

The Barrenfork had a regular wireless set, but did not have an operator on board; I do not think, however, that the failure to have a radio operator made any difference here.

The storm signals were flying when she went out, and it was the duty of the Barrenfork's master to see them; but I do not believe that, after he had gone out, anything developed sufficient to cause him to go back again or do otherwise than he actually did in connection with his maneuvers when he turned north on the morning of October 22d.

So I hold that, even if it should be considered that a wireless operator was, although not a statutory requirement, a necessary equipment for a tug, to make her seaworthy, the absence of the wireless operator here did not in any way contribute to this loss, which I place entirely on the unseaworthiness of the barge Chehaw for the reasons above given.

VIII. When we come to the question of limitation of liability, however, the petitioner has the best of it. There I think that Mr. Sexton is on sound ground. The lumber ports, the failure of which was the cause of the damage, are ports which, as above intimated, have to be opened and closed by the master of the barge at the place where she may be preparing to go to sea.

I do not think such closing comes in any way within the owner's nondelegable duties, and, consequently, I find that the fact these ports were not properly closed and caulked does not make Mr. Sexton guilty of any privity or knowledge under the provisions of the Limitation of Liability Act which would preclude his having his limitation.

IX. Counsel have called to my attention that a claim for salvage has been filed by the owners of the Barrenfork, arising out of the fact that the barge was taken into Lookout, and there, by the use of the tug's pump and equipment and the assistance of the crew, so reconditioned as to enable her to proceed to Charleston.

This claim of salvage, if indeed it can properly be considered as such, which I leave to the commissioner to determine, is a claim that will eat into the value of the limitation fund, and, consequently, would be a prior claim to that of the cargo owners, and must be so dealt with by the commissioner.

X. Following my usual procedure, I shall sign an order providing that this opinion may stand as the findings of fact and conclusions of law in this case.

The following decrees may then be entered:

1. A decree holding the petitioner Emory Sexton, as owner of the Chehaw, liable for the damage to the cargo, and providing that his liability be limited in accordance with the provisions of law, and that the matter be referred to a special commissioner to fix the damages in the limitation proceeding.

2. A decree in the case of Max Rockmore, Trustee, v. E. A. Buck et al., as Charterers, providing for the reference of the case to a commissioner for proceedings not inconsistent with what I have said in this opinion, to determine whether there was any demurrage due from the charterers and/or the United States Industrial Alcohol Company for any delay at the ports of loading and discharge, and excluding delay at the ports of refuge.

3. A decree dismissing the libel of the United States Industrial Alcohol Company against the Marine Contracting & Towing Corporation, as owner of the tug Barrenfork.

XI. As to costs:

In the limitation case, as Mr. Sexton has prevailed on his right to limit, he may have the costs involved in that part of the proceeding, and, on the question of liability, the claimants may have their costs for such part of the proceeding as is involved in their

650

claim as distinguished from Mr. Sexton's claim for limitation. This will include the costs of the reference, if any is had.

In the case of Max Rockmore against E. A. Buck et al., the costs will have to follow the result as reported to the commissioner, and in the third case the owners of the Barrenfork may have costs against the United States Industrial Alcohol Company on the dismissal of the libel filed by it.