105 F.2d 113 (1939)
THE DOYLE.
No. 6815.
Circuit Court of Appeals, Third Circuit.
June 6, 1939.
Rehearing Denied August 5, 1939.
Dechert, Smith & Clark, of Philadelphia, Pa. (Owen B. Rhoads, of Philadelphia, Pa., and Thomas H. Middleton, of New York City, of counsel), for appellant.
Howard M. Long and Howard T. Long, both of Philadelphia, Pa., and A. Moulton McNutt, of Camden, N. J., for appellee Cox.
Shields, Clark, Brown & McCown and Samuel B. Fortenbaugh, Jr., all of Philadelphia, Pa., for appellee Sheridan & Co.
Before MARIS and CLARK, Circuit Judges, and KALODNER, District Judge.
CLARK, Circuit Judge.
We are constrained to reverse the judgment of the learned district judge. We do so with a full realization of the rule applicable in admiralty and in other branches of the law where a judicial or quasi-judicial officer is the trier of the facts. The Calvert, Eastern Transp. Co. v. Insley, 4 Cir., 51 F.2d 494. In the instant case, however, *114 we do not find occasion for the exercise by the learned district judge of his function of estimating the credibility of witnesses, etc. We think moreover that he might have reached a different conclusion if what we deem to be the proper legal issues had been more sharply outlined in the trial before him.
It may tend to clarity if we state what seem to us the legal relationships of the litigants. The libellant-appellant, E. I. du Pont de Nemours & Company, Incorporated, is a shipper who suffered a cargo loss. The claimant and respondent-impleaded (under Admiralty Rule 56, 28 U.S. C.A. following section 723) appellee Dr. Cox, a veterinarian, is the owner of four deck-load barges or lighters without motive power and with an attendant (or nautically perhaps a captain) in charge of each. The respondent in rem, the Lighter Doyle, is that one of those barges which carried, or rather failed to carry, libellant's cargo. The respondent-appellee, Sheridan & Co., Inc., is a towing company owning tugs and barges.
The barge was "chartered" by its owner to the respondent towing company under a verbal arrangement for a voyage from a ship, S. S. Suwied, anchored in the Port of Philadelphia to Paulsboro, a few miles down the Delaware River. The libellant loaded the barge with a cargo of sulphur consigned to it and stowed in the hold of the Suwied. This cargo filled the entire capacity or full (whole) reach and burthen of the lighter, i. e., all of its available deck space. James, Carriage of Goods by Sea  The Hague Rules, 74 University of Pennsylvania Law Review 672, 689, The Liver Alkali Works Co. (Ltd.) v. Johnson, Court of Exchequer, Aspinwall's Reports, Maritime Cases, 1 New Series 380. On the voyage the barge sprang a leak and had to be beached with consequent damage to cargo.
These facts placed the parties in the legal categories hereinafter noticed. The owner of the barge is a private and not a common carrier. The entire capacity or full reach doctrine is well established. The William I. McIlroy, 37 F.2d 909, D.C.E.D. N.Y.; Warner Sugar Refining Co. v. Munson S. S. Line, 23 F.2d 194, D.C.S.D.N.Y.; The C. R. Sheffer, 2 Cir., 249 F. 600, 601; The Maine, 161 F. 401, D.C.S.D.N.Y.; The Fri, 2 Cir., 154 F. 333. The American cases make no exception for or against the owner of fleets of small vessels such as barges. They may well have done so, The Liver Alkali Works Co. (Ltd.) v. Johnson, above cited, although the question is involved in an estimate of the rationale of the common carrier insurer doctrine. We need hardly cite to show that a private carrier is a bailee and so bound to the exercise of reasonable care only. 58 C.J. sec. 484, p. 340.
We spoke of the verbal arrangement between the claimant and the respondent as a charter. The term has been used broadly and even loosely both here, 7 American and English Encyclopaedia of Law, 2d Ed., 163, and in foreign countries, Danjon, Manuel de Droit Maritime, Titre III  Affretement, Chapitre I  Nature et Varietes de L'Affretement; Lacour, Precis de Droit Maritime, Troisieme Partie, Chapitre Premier-Contrat D'Affretement. Such use has sometimes obscured the distinction between the demise of a vessel and a simple contract of affreightment. 7 American and English Encyclopaedia of Law, 2d Ed., 164. But the authorities have not been puzzled by the relationship established by facts such as those of the principal case. So we find the Court of Appeals for the Second Circuit ruling: "Charters of barges without motive power, accompanied by a bargee paid by the owner, are demises". Ira S. Bushey & Sons v. W. E. Hedger & Co., 2 Cir., 40 F.2d 417, 418. And to the same effect, The Nathaniel E. Sutton, 42 F.2d 229, D.C.E.D. N.Y.; The R. Lenahan, Jr., 2 Cir., 48 F.2d 110; Moran Towing Etc. Co. v. New York, 36 F.2d 417, D.C.S.D.N.Y.; 58 C.J. sec. 235, p. 163. The so-called charterer becomes owner pro hac vice. 58 C.J. sec. 224, p. 153. His obligations are legally, if not factually, the same, 7 American and English Encyclopaedia of Law, 2d Ed., 165.
Accordingly, we must inquire as to the presence or absence of negligence. The circumstances being maritime, the duty of care is that of providing a vessel with ability to successfully withstand those circumstances. To put it in one descriptive word, a vessel in a state of seaworthiness, or as the French phrase it, "en bon etat de navigabilite". Lacour, Precis de Droit Maritime, p. 122. An unexplained sinking in calm water imports unseaworthiness. That needs no citation of authority. Boats are built to float. The claimant's explanation of his sinking is "contact with a submerged floating object". The same explanation has occurred to others.
"The owner, Transportation Company, stressed the importance of a scar which *115 was found on the side of the barge when she was put on the ways. The contention was that this scar was sufficient to cause a sudden sinking, and that its course showed that the barge had struck some submerged object and then passed over it. It was pointed out that the striking of submerged objects is not an infrequent occurrence in navigation, that the insurance records and law books contain many such cases". The Calvert, Eastern Transp. Co. v. Insley, 4 Cir., 51 F.2d 494, 497.
The object had to be submerged because no one saw it and it had to be floating because the river was deep and wide. A nice balance of specific gravity tends rather to possibility than to probability.
Perchance because of their legal prevalency, courts have been somewhat skeptical of the factual existence of these "submerged floating objects".
"Collision with a floating log might indeed be a sea peril (Louis-Dreyfus v. Paterson Steamships, 35 F.(2d) 353, D.C.W.D. N.Y.), but that there was any such collision is pure speculation." The Mauretania, 2 Cir., 84 F.2d 408, 410.
See also The Calvert, Eastern Transp. Co. v. Insley, above cited, The Rose Murphy, 5 Cir., 32 F.2d 87; The Northern Belle, 9 Wall. 526, 19 L.Ed. 746. We share the skepticism of all these learned judges. Here the only direct testimony with respect to any impact or contact of navigation is that of the barge attendant or captain. He said:
"Q. * * * I heard a commotion of some kind and looked down the hatch and water was flowing in.

* * * * * *
"Q. This commotion you described what do you mean by `commotion'? A. It must have been the flow of the water coming in from underneath". Record, pp. 100, 101.
Similar testimony was not deemed persuasive in a recent case before the learned district judge whose decision is here appealed.
"* * * the respondent ascribes the sinking to the barge having collided with some submerged obstruction. * * * The only evidence to support such a theory is that what is described as a `jolt' was felt.
"The only comment to be made upon this evidence is that it is not sufficient to warrant the finding that the barge sank because of striking some unknown obstacle to navigation * * *." Charles Dreifus Co. v. Diamond P. Transp. Co., 7 F.Supp. 363, 364, D.C.E.D.Pa.
For some reason this case was not cited to us nor presumably to the learned district court, despite the fact that the same counsel appeared to have been there involved.
It is true that there is the further circumstantial evidence that a hole in the barge was found by the surveyors after the beaching. They described this hole as caused by a V-shape pushing in of about twelve inches. We wish the learned district judge had had an opportunity to examine a case in the Fourth Circuit on this point (as it was not cited to us we feel safe in assuming he had not). In that case, the learned district court for the District of Maryland had occasion to consider a very similar "disaster". The barge, which there disappeared beneath the waves of Chesapeake Bay, was, as here, the object of salvage operations, the only difference between the cases being that the salvage here (beaching) began before the barge got to the bottom. The learned district judge in discussing the causal origin of the opening in the barge said:
"A further argument made by claimant carries more weight. It is to the effect that, since there was no mark or abrasion behind or on either side of the opening, such as it is reasonable to assume must have been made if the vessel, while afloat, freed itself from the obstruction, this indicates that the damage was not caused before she sank. Had the barge freed itself while under way from the obstruction, such escape would, it would seem, have been evidenced by greater injury to the planking at the last point of contact.

* * * * * *
"What, then, is the inevitable result of the weight of the credible evidence? That the hole was caused either as the Calvert foundered, or in the course of the salvage operations. While there is no evidence that the injury was inflicted in the course of the salvage operations, this inference is the more reasonable because of the means, heretofore described, that had to be employed in order to raise her and get her to dry dock; that is to say, the chances of causing this kind of injury to her were very substantial. No one saw the vessel's bottom until she was dry-docked. Then, for the first time, the scoring and the hole became known. The damage may have *116 been due to no negligence on the part of the salvors, but to the difficulties surrounding their task". In re Eastern Transp. Co., The Calvert, 37 F.2d 355, 361, D.C.Maryland, affirmed 4 Cir., 51 F.2d 494.
We cannot agree with the "submerged floating object" explanation of the sinking of the Lighter Doyle.
Even if we were so satisfied, we would still find her unseaworthy. We have seen that seaworthiness is due care under the circumstances of the sea. In human affairs it is "due" to anticipate and provide against ordinary and usual circumstances. The unusual and the exceptional need not be foreseen or guarded against. In the nomenclature of maritime law, the phrase expressive of this thought is "peril of the sea". Duche v. Thomas & John Brocklebank, 2 Cir., 40 F.2d 418; The Warren Adams, 2 Cir., 74 F. 413; The Giulia, 2 Cir., 218 F. 744; The Warren, 40 F.2d 700, D.C.W.D.Wash.S.D.; The Catharine Chalmers, Court of Admiralty, Aspinwall's Reports, Maritime Cases, 2 New Series 598; The Northumbria, Court of Appeals, Aspinwall's Reports, Maritime Cases, 10 New Series 314; The Xantho, Court of Appeals, Aspinwall's Reports, Maritime Cases, 6 New Series 7; Montier, Le Harter Act. We must search for the unusual in the contact of navigation of the principal case. Manifestly all floating objects, whether submerged or on the surface, do not represent an exceptional circumstance. It is common knowledge that the waters, particularly rivers and harbors, are strewn with the flotsam and jetsam, to pervert a nautical expression, of life on land. Furthermore, in a liquid medium we are not troubled with the "irresistible force" and the "immovable object". For example, a floating fruit crate could not be classified as unprecedented and so a peril which a barge need not resist and still claim seaworthiness.
By definition, collision and its effects depends upon the mechanics, physics and chemistry of the colliding objects. We are without knowledge as to those factors of the submerged floating object. If that were all, we would be faced with an interesting question in a confusing field, the burden of proof. The Southwark, 191 U. S. 1, 24 S.Ct. 1, 48 L.Ed. 65; The Sundial, 2 Cir., 43 F.2d 700; The Indien, 9 Cir., 71 F.2d 752; Compania Naviera Mexicana v. Sporl, 5 Cir., 11 F.2d 777; The Northumbria, 10 N.S. 314, above cited.
From this examination we conclude that our egg crate is almost more than an illustration. The barge was of "uncertain age" (owned by Shamrock Towing Company ten years ago). R. p. 111. This has been considered a significant fact. Sanbern v. Wright & Cobb Lighterage Co., 171 F. 449, 452, D.C.S.D.N.Y.; Davis v. Dittmar, 2 Cir., 6 F.2d 141, 142. Except for some personal caulking, the repairs never seemed to concern themselves with the planking, and to have been of a generally trivial character. Record, pp. 38, 113. The cases naturally stress this also. Sanbern v. Wright & Cobb Lighterage Co., above cited, D.C., 171 F. at page 453.
The most important testimony is of course that of the surveyors. They, as usual, disagreed in many particulars and the learned district judge did not give us his opinion as to their respective credibility. One cannot help endorsing the sentiments of the learned English judge who in discussing a similar situation said: "It is extremely discreditable that on a question of fact of this sort there should be such a conflict of testimony". The Northumbria, Court of Appeals, Aspinwall's Reports, Maritime Cases, 10 N.S. 314.
Libellant's surveyor painted a dismal picture of decaying wood and rotting timbers. R. pp. 154, 167. Since he may have been biased we prefer to rely upon and quote one item of testimony given by the surveyor and naval architect called by the claimant, Dr. Cox. It appears on page 171 of the Record and reads as follows:
"Q. Did you find any rot in the bow planks? A. Yes, it was soft.
"Q. Where you could sink a knife blade in? A. I found some places where you could sink a knife in".
We may say that apart from this conflict between the surveyors the only evidence of seaworthiness seems to be the failure of the barge to sink during the eighteen hours or so it was loaded. The learned district court stressed this fact. We think it not relevant to the question of proper resistibility to floating objects. A barge might very well not leak in calm water and yet crumple upon its first encounter with a chicken coop.
Once the central fact of unseaworthiness is established the various liabilities arrange themselves readily. In fact we believe that they will be conceded. Dr. Cox, the owner respondent, boasted of his *117 familiarity with his barges. He rather expressed outrage at the implication that his extremely conservative repair bills betokened any failure on his part and spoke feelingly of the efforts of workmen whose hiring appears unrecorded. He must have had knowledge, therefore, of the condition of the Doyle's planking. To send her out in that condition constituted the failure to exercise reasonable care of the landlubber or the lack of due diligence more often on the tongues of those who go down to the courts about ships. The T. J. Hooper, 2 Cir., 60 F.2d 737. Care being the burden of his bailment, he has fallen below its standard and is liable. The Chehaw, 54 F.2d 645, D.C.S.D.N.Y.
The position of the towing company charterer is of course otherwise. Assuming them as we have said to be pro hac vice owners, the measure of their liability is the same and can therefore be no greater than that of the actual owner. It can be, and we think is, less. The rule is due care under the circumstances and the charterer's circumstances are different. The barge, as we have seen, was loaded and showed no signs of leaking for approximately twenty hours before the accident. Its defects were then distinctly latent or in other words ascertainable only on close inspection. We do not think that one who takes a vessel on demise is under a duty to cast a surveyor's eye (or knife) upon its timbers. That, in the effective conduct of maritime affairs, is the province of the proprietor. He has the facilities and he must use them. In that view we are not troubled, as was the learned district judge, with the judicial admission of the petition to implead. Such admissions to be binding must be unequivocal, 22 C.J. 330 (here it is "apparently unseaworthy"), and anyway they may be disregarded in the interests of justice, Wigmore, Vol. 4, sec. 2590.
The gravamen of our decision makes it unnecessary for us to consider the application, if any, of the so-called Harter Act, 46 U.S.C.A. §§ 190-195, intended for the relief of common or public carriers. That Act, as is known, approximates for certain states of facts the liabilities of the two kinds of carriers. Montier, Le Harter Act; Evans, The Harter Act and Its Limitations, 8 Michigan Law Review 637; 24 Cong.Rec. Part I, p. 147, Part II, p. 1291. Here that approximation would take place as to the towing company and not as to the lighter and its owner. So even under a holding of "public utility", our decision would be the same. Incidentally it is curious to note, as the cases do not, the omission of the word charterer from the first two sections (the cargo owner public policy provisions) of the Act. The word was added to Section 3 by Amendment in the Senate, 24 Cong.Rec. Part II, p. 1181. The Carriage of Goods by Sea Act, 46 U. S.C.A. § 1301, Hague Rules, which has superseded the Harter Act except for inland waters, employs a general definition, 23 Virginia Law Review 590 (note).
The interlocutory decree of the district court is reversed and the libel is remanded with instructions to enter a decree in accordance with this opinion.