## THE EMILIA.

District Court, S. D. New York.
Dec. 3, 1935.

Hill & Rivkins, of New York City (Robert E. Hill, of New York City, of counsel), for libelants.

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., and Frank J. Zito, both of New York City, of counsel), for claimants and respondents.

COXE, District Judge.

This is a suit in admiralty for sea water damage to shipments of refined sugar, raw sugar, and tobacco, carried to New York from San Juan, Puerto Rico, on the Steamship Emilia, sailing from San Juan on March 18, 1931, and arriving at New York on March 24, 1931.

On the voyage, heavy weather, with high, choppy seas, was encountered off Cape Hatteras, and the strain on the vessel fractured a deck plate at the starboard forward corner of No. 4 hatch, allowing water to enter the No. 4 'tween deck, and from there to overflow into the lower hold. The crack through which the water flowed into the 'tween deck was about eleven inches in length.

The refined sugar was stowed in the 'tween deck under the starboard forward corner of the hatch; the tobacco was also in the 'tween deck about seventeen feet aft of the forward end of the hatch; and the raw sugar was in the hold below. The damage to the refined sugar and the tobacco was "entirely on the bottom," except that some of the refined sugar directly under, or very near, the broken deck plate, was also damaged at the top. When the vessel reached New York, and the hatch was opened, it was found that the 'tween deck scuppers had become clogged, and Captain Lynner, testifying for the Emilia, estimated that there might have been as much as four inches of water and molasses standing at that time on the starboard side of the 'tween deck. I am satisfied from this showing that there was considerable accumulation of water in the 'tween deck during the voyage.

The bills of lading for the different shipments contained provisions exempting the carrier from liability for damage caused by sea perils; they also excepted damage resulting from unseaworthiness, "although existing at the time of shipment * * * or at the beginning of the voyage," provided due diligence was used to make the vessel seaworthy. These provisions are valid as not being in violation of the Harter Act (46 U.S.C.A. §§ 190–195). The Willdomino (C.C.A.) 300 F. 5, affirmed 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491.

The contention of the respondents that the damage was occasioned by sea perils is without merit. The weather, although severe, was only what should reasonably have been expected off Cape Hatteras at this particular time of year. The wind force never went higher than 9 on the Beaufot scale; none of the boats or fittings was carried away; and the only injury sustained by the vessel was the fracture of the deck plate at the No. 4 hatch. It is quite evident, therefore, that the storm was not of such "extreme violence" as to constitute a good exception in a bill of lading. The Rosalia (C.C.A.) 264 F. 285; The Edith (C.C.A.) 10 F.(2d) 684; Franklin Fire Ins. Co. v. Royal Mail, etc., Co. (C.C.A.) 58 F.(2d) 175.

■■ The libelants further insist that the vessel was structurally weak around the No. 4 hatch, and, therefore, unseaworthy at the commencement of the voyage. The implied warranty of seaworthiness is an absolute one, and not dependent on lack of knowledge or negligence on the part of the shipowner. The Edwin I. Morrison, 153 U.S. 199, 14 S.Ct. 823, 38 L.Ed. 688. The test is "whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." The Silvia, 171 U.S. 462, 19 S.Ct. 7, 8, 43 L.Ed. 241; In re Gravel Products Corp. (C.C.A.) 24 F.(2d) 702. Applying this test to the Emilia, it is apparent that the vessel was not seaworthy with respect to the deck plate, for "the voyage was of exactly the kind that she should expect." Franklin Fire Ins. Co. v. Royal Mail, etc., Co. (C.C.A.) 58 F.(2d) 175, 176.

■■ Was due diligence used to make the vessel structurally sound before leaving San Juan? I think it was, unless an impossible standard of care is required; and nothing of that kind is suggested by the authorities. The vessel was built by the Bethlehem Company in 1918, and I do not understand that there is any criticism of her design or of the way she was constructed. She was purchased from the Shipping Board in 1929, and was at that time completely overhauled and reconditioned. Her ratings were always of the highest. In February, 1931, she was due for a semiannual inspection, and was sent to the Fletcher yard at Hoboken for that purpose. While there, she was thoroughly examined, and, in the course of the examination, it was discovered that there was a crack (which had an appearance of being old) in a longitudinal deck beam at the No. 4 hatch. This deck beam was removed and a new one installed; and "approximately two feet of the angle bar" at the coaming of the No. 4 hatch was welded to the deck. There was no fracture of the deck angle, and the men in the Fletcher yard, who had charge of the work, testified positively that there was no crack or welding in the deck plate. After the repairs had been made, the vessel was inspected and passed by the American Bureau; and on February 28, 1931, she started for Puerto Rico, arriving at San Juan on March 10, 1931. Before leaving San Juan on March 18, 1931, on the return voyage, the No. 4 hatch was again inspected and no evidence of any structural weakness was found at that point. I do not know what more than this could fairly be asked to satisfy the requirements of due diligence.

■ It remains to consider whether the drainage of the 'tween deck was sufficient, and whether proper care was used in that respect. There were two inch scuppers at the forward corners of the 'tween deck draining into the bilges at the bottom of the vessel, and these were adequate for the purpose. There is, however, no satisfactory evidence that the scuppers were open when the vessel left San Juan. Losey, the second officer, testified that before the cargo was loaded he flashed a light into the scuppers, and saw that they "was clear." He also said that it was the practice to water test the scuppers "every two or three months," and that before leaving San Juan he poured water into the pipes from a bucket. When pressed on cross-examination to tell how many buckets were used, he said "I don't know—four or five." He explained that the chief officer was on the weather deck heaving the buckets of water over the side of the ship, and that he was down below—presumably on the 'tween deck pouring the water into the scuppers. This testimony is too vague to be entitled to much weight; and Losey's whole credibility is seriously affected by his repeated assertions that the scuppers were in the after end of the compartment, which was directly contrary to the fact. However, the test of the scuppers was in any event insufficient, as the amount of water used was uncertain, and there was no one in the hold to see whether the water ran through the pipes into the bilges. It has been held that the effective way to test scuppers is with a hose. The Cornelia (D. C.) 15 F.(2d) 245; The J. L. Luckenbach (D.C.) 1 F.Supp. 692, affirmed (C.C.A.) 65 F.(2d) 570; The Manuel Arnus (D.C.) 10 F.Supp. 729; and although other methods may be equally satisfactory, provided enough water is used, and care is taken to see that it runs through the pipes, I think that in the present case the test was ineffective; certainly the proof is lacking to sustain the carrier's burden of showing either seaworthiness with respect to the scuppers, or that due diligence was used. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L. Ed. 65.

I therefore hold that the respondents have not brought themselves within the exceptions of the bill of lading in so far

as the drainage facilities are concerned, and a decree is accordingly directed for the libelants, with costs.