## THE MAURETANIA.
### No. 397.

Circuit Court of Appeals, Second Circuit.
June 22, 1936.

both of New York City, of counsel), for libelants.

Lord, Day & Lord, of New York City (Allan B. A. Bradley, James S. Hemingway, and Charles W. Merritt, all of New York City, of counsel), for claimant-respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

In this case * shippers of cargo carried by the steamship Mauretania in February, 1932, sue for damage to their merchandise by sea water. The vessel sailed from Southampton on February 17th, called at Cherbourg, and arrived in New York on February 23d. The cargo in question was stowed in the "harbor deck" of No. 1 hold, the refrigerating space below, and the lower hold or "trimming tank." During the voyage sea water entered through a defective porthole, the forward one of four on the left side of the harbor deck, and thence overflowed through the hatchway to the decks below. When the cargo was removed at New York, some twelve inches of water was found in the after end of the harbor deck in the way of the scuppers. Inspection failed to disclose how the water had entered, but a hose test showed the damaged port. There is no criticism of the construction of the port. It was of the usual type, having a hinged port light set in a heavy brass ring, and a cast-iron deadlight which was also hinged and adapted to be bolted down on the inside over the port light. The damage consisted in a bending inward of the brass frame, hinge-pin, and lugs of the port light, causing an opening between the bent frame and the ship's side; also the glass of the light was cracked. The deadlight was uninjured.

The libelants proved delivery of the cargo to the carrier in good order and condition and its out turn at destination in damaged condition. To meet this prima facie case [The Folmina, 212 U.S. 354, 363, 29 S.Ct. 363, 53 L.Ed. 546; The Warren Adams, 74 F. 413, 414 (C.C.A. 2)], the respondent relies upon exceptions in the bills of lading, some of which incorporate the

Hill & Rivkins, of New York City (Robert E. Hill and Barton P. Ferris,

*A prior appeal [The Mauretania, 80 F. (2d) 225 (C.C.A. 2)] was withdrawn and such action had in the district court that the present appeal enables us to consider the merits of the controversy.

British Carriage of Goods by Sea Act of 1924, and others embody the so-called Continental form.

 It is first contended that the damage resulted from a peril of the sea. The weather, however, was not such as to substantiate this claim. The log recorded no wind higher than fresh or moderate gales, force 7 or 8 on the Beaufort scale. The sea was recorded as very rough, but such winds and seas are nothing more than expectable heavy weather in the North Atlantic in February. It is urged, however, that perils of the seas are not limited to excessively heavy weather; that damage to the port must have been caused by an external force sufficient to bend the frame of a properly constructed and properly fastened port; and that this is circumstantial proof that a sea peril caused the damage. It is suggested that the port may have been struck by some floating object, such as a log, or that a wave hit it in such a way as to exert an unusual pressure that the port could not withstand. Collision with a floating log might indeed be a sea peril [Louis-Dreyfus v. Paterson Steamships, 35 F.(2d) 353 (D. C.W.D.N.Y.)], but that there was any such collision is pure speculation. As to the other suggested cause, it is very hard to believe that, if both port light and deadlight were properly fastened, the pressure of a wave could not only crack the glass but also lift the frame from its seat. It would be easier to understand if the deadlight were not firmly fastened. After all the testimony as to fastening was given by witnesses who had much to lose if they had failed to fasten it, and the work they described was routine. Smith, the carpenter, said it was still tight on arrival at New York. He did not use the spanner, but merely tried it with his hand. This can have little weight as corroborating his testimony that it was tight when the vessel broke ground. It would seem that the warping of the frame of the port light might cause the deadlight to feel tight thereafter, even if loose before. The respondent had the burden of proving that the damage resulted from a peril of the sea [The Rosalia, 264 F. 285, 288 (C.C.A.2)], and we cannot say that the commissioner's adverse finding was so plainly wrong as to justify reversal.

 Other bills of lading exceptions relied upon required the respondent to have used due diligence to make the ship seaworthy prior to the commencement of the voyage. This was not done with respect to the two scuppers which drained the harbor deck. Each pipe had a diameter of 2½ inches and an area of nearly 5 square inches. Each was covered by a grid or strainer which had a drainage area of only one square inch. Expert witness French said the grid should have an open area nearly equal to that of the pipe. Expert witness Stanley allowed a difference of 20 per cent. at the most. Obviously the effective draining power of a pipe is the open area of its grid. These grids had only two square inches together, and moreover the openings were only one quarter of an inch in width so that they would easily clog. Disregarding all question about the covers, we think the drainage equipment was plainly inadequate, and that given the possibility of a leak, this rendered the harbor deck and the spaces below it an unseaworthy place for cargo. That such lack of drainage may have contributed to the loss can scarcely be disputed. Accordingly, the claimant-respondent's appeal must fail.

 Certain causes of action were dismissed on the ground that the libelants had failed to give notice of claim as required by the following clause in the Continental bills of lading: "The carrier is not to be liable for any damage to any goods which is capable of being covered by insurance nor for any claim for short delivery of, or damage to the property hereby receipted for unless notice of such claim is given in writing before removal of the goods or of such part of the goods as are discharged from the vessel at the port of discharge * * *." The interested libelants have appealed from this part of the decree. A similar clause was sustained in Anchor Line v. Jackson, 9 F.(2d) 543 (C.C.A.2); but the appellants attempt to avoid the effect of that decision on the ground that the point now raised was not there presented. Their point is that the first part of the clause (relating to insurance) is invalid and must be stricken out, leaving the second part (relating to notice) unintelligible because it lacks the opening phrase, "The carrier is not to be liable for any damage to any goods." This argument is altogether unreal. The clauses are distinct and independent. The invalidation of the provision as to insurance does not prevent a court from in-

corporating into the provision as to notice the opening phrase which obviously was intended to be applied to both provisions. We adhere to Anchor Line v. Jackson.

The alleged waiver by rejection of claims on grounds other than failure to comply with the notice provisions is no defense. W. R. Grace & Co. v. Panama R. Co., 12 F.(2d) 338, 340 (C.C.A.2). See, also, Southern Pac. Co. v. Stewart, 248 U.S. 446, 39 S.Ct. 139, 63 L.Ed. 350. The notice had to be "given," that is, received by the carrier, before the goods were removed. This is obviously the meaning, because the very purpose of the notice is to allow the carrier to examine the goods before the owner takes them away. The libelant's appeal must also fail.

Decree affirmed.