## THE CITY OF KHIOS.

### HECHT, LEVIS & KAHN, Inc., v. ELLERMAN & BUCKNALL S. S. CO.

District Court, S. D. New York.
July 22, 1936.

Hill & Rivkins, of New York City (Robert E. Hill and Eugene P. McCue, both of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. deGrove Potter and William H. Postner, both of New York City, of counsel), for respondent.

COXE, District Judge.

This is a suit for cargo damage to seven lots of bales and cases ribbed smoked sheet rubber carried from Singapore and Penang to New York on the steamship City of Khios. The rubber was admittedly in good condition in October and November, 1933, when it was received for shipment; and, after a winter North Atlantic voyage, it was discharged at New York on December 28, 1933, with a large number of the bales punctured and mangled, and many of the cases badly broken. Herlihy, the cargo surveyor, and Parker, the ship's surveyor, agreed that the condition of the rubber at the time of discharge was the worst they had encountered in their surveying experience.

The shipments were made under the usual form bills of lading, which incorporated by reference the British Carriage of Goods by Sea Act; and it is the contention of the respondent that the damage resulted from excepted causes for which the respondent was not liable. The particular exceptions relied on are, perils of the sea, insufficiency of packing, and the omnibus exemption of the Carriage of Goods by Sea Act.

■ The burden is on the carrier to establish that the loss was from an excepted cause. The Rosalia (C.C.A.) 264 F. 285;

Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. And, when that has been shown, it is necessary for the shipper to prove negligence in order to take the case out of the exception. The Arpillao (C.C.A.) 270 F. 426; Schnell v. The Vallescura, supra.

■ The contention that the damage was due to sea perils has not been sustained. The vessel was on a two-month voyage from the Far East, and it was reasonably to be expected that in the North Atlantic, at that particular time of year, severe weather would be encountered. The log records that there was a whole gale at 4 a. m. on December 19, 1933; and at 8 a. m. similar weather prevailed, and there were squalls of hurricane force. This continued until noon, but in the afternoon the weather moderated. Yet at 10 a. m. on the same day the crew were able to unship the after No. 1 hold ventilators on the exposed forward deck, leaving the forward No. 1 and No. 2 ventilators untouched. And the vessel sustained no structural or other damage of any consequence. I do not think that this is a sufficient showing to make out a case of sea perils, The Rosalia (C.C.A.) 264 F. 285; The Edith (C.C.A.) 10 F.(2d) 684; Franklin Fire Ins. Co. v. Royal Mail Steam Packet Co. (C.C.A.) 58 F.(2d) 175; The Emilia (D.C.) 13 F.Supp. 7; and there was no evidence that the British law is in any way different from that indicated by these authorities.

■ The criticism of the packing is directed entirely against the bales, and does not concern the cases. The baled rubber was packed in burlap bags, such as are customarily used for rubber shipments from the Far East; and Willett, the second officer, stated they were in good condition when received on board the vessel. It is said, however, that there should have been talc, or some other protective material, underneath the covers to prevent the burlap from adhering to the rubber. But there was no satisfactory proof of any established practice to that effect; and the punctured and mangled condition of the bales at the time of discharge can hardly be explained by normal pressure. Moreover, the condition of the case rubber on discharge was fully as bad as the baled rubber. These cases were of live wood, with metal binding and stiffeners; and it is difficult to understand why they also should have outturned in damaged condition, if, as assert-

ed by the respondent, the trouble was wholly with the packing.

It is finally insisted that the stowage was proper. The rubber was stored in the No. 1 and No. 2 holds, and the baled rubber rose to a height of about seventeen tiers. Willett described in considerable detail the way the tiers were built up, and how the dunnage was placed. He was present when the vessel was unloaded, and said that he "saw no damaged cargo" and that the rubber turned out in "good condition." Indeed, he admitted that he received a bonus from the owners for the "excellent out-turn." This testimony was, of course, completely contrary to the fact as found by Parker, the ship's own surveyor, and it discredits to a large extent Willett's whole testimony with respect to the character of the stowage. It is true that Parker also testified regarding the stowage, but his testimony was general, and it is not particularly helpful in showing how the rubber was stowed. It may well be that it is customary to stow baled rubber to a height of seventeen tiers, but I can see no reason why, if the carrier wishes to employ that method of stowage, it should not be responsible for such damage as has been proved in this case. See Doherr v. Houston (D.C.) 123 F. 334, affirmed (C.C.A.) 128 F. 594.

There may be a decree for the libelant, with costs.