## THE HOKKAI MARU.

### UNIVERSAL LEAF TOBACCO CO. OF CHINA, Inc., v. OSAKA SHOSEN KAISHA.

District Court, S. D. New York.
Oct. 22, 1936.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley, of New York City, of counsel), for libelant.

Crawford & Sprague, of New York City (George C. Sprague, of New York City, of counsel), for claimant.

HULBERT, District Judge.

Libelant sues for cargo damages.

Corporate existence of the parties, ownership of the vessel and cargo in question,

and the essential jurisdictional allegations were stipulated upon the trial.

The principal question involved is one of proper stowage.

The steamship Hokkai Maru is a modern, twin screw, steel vessel, Diesel engines, having an ordinary sea speed, loaded, of about 16½ knots per hour. She was built at Nagasaki, Japan, in March, 1933, is 445 feet long, 60 feet 6 inches in width, and her depth of hold is 40 feet 9 inches.

On her second voyage from Atlantic ports through the Panama Canal to Los Angeles, she took on board, at New York, 27 steel drums, each 4 feet high, 2½ feet in diameter, and containing dye intermediate known as "ortho-toluidine." Each drum weighed 1,000 pounds and they were stowed in the starboard wing of the lower No. 3 tweendeck under the supervision of a surveyor of the Board of Underwriters of New York.

The captain testified that he had carried dye intermediates, which are not listed by the Board of Underwriters as hazardous, on seven or eight previous occasions without mishap and considered it proper stowage to put this commodity in the lower tweendeck with lubricating oil, electrical machinery parts, asphaltum, cottonseed oil and grease.

The drums were stowed in four tiers of six drums each, and a half tier of three drums forward thereof, placed end-up on dunnage planks and lashed with 3½ inch comparatively new manila rope, four times around the bulk. Immediately aft of these drums of dye were two tiers of lubricating oil in drums. There were four permanent stanchions, one at each corner of the hatch coaming and two temporary or auxiliary removable stanchions were replaced. These stanchions are in shape of round pillars about 10 inches in circumference and extend from the floor of the No. 3 lower tweendeck to beams atop of compartment and tightly fastened and about on a line with the permanent stanchions of that hatch coaming. On the ship's side and between these stanchions are cleats and brackets. It was intended to load cottonseed oil at Los Angeles to be stowed on top of the covers of the deep tanks and dunnage boards were used, not only for separation, but for the purpose of securing the cargo of dye stuffs and the cottonseed oil. This lumber was supported by tank top coaming and by stanchions on the bottom, and on the top part by a longitudinal frame. In lashing the drums use was made of the cleats, brackets, and stanchions. There were also two rims or bands on the drums, one about a quarter of the distance from the top and another a like distance from the bottom. These rims projected one and one-half inches and were one-half inch wide, and gave the rope a purchase or grip. There was also a cross section of ropes between the drums connecting the ropes on opposite sides for the purpose of making them more taut. A diagram was produced upon the trial, and the witness Annen, third officer, testified by deposition, in great detail, indicating the particular manner in which the lashing had been done.

The ship sailed from New York, September 9, 1933, and upon arrival at Newport News the next day, took on board 1,000 wooden casks or hogsheads of tobacco, 158 of which were stowed in the upper No. 3 tweendeck, under the supervision of a surveyor of the Board of Underwriters of New York who gave his certificate therefor. Of course, these certificates were merely presumptive evidence. Libelant offered proof by experts that the drums should have been stowed as deck cargo or lashed with wire rope and protected forward by a temporary bulkhead or crib. At Newport News the stowage and lashing of the drums of dye intermediate were examined and found to be in perfect condition, as was also the case upon the arrival of the vessel at Los Angeles on the 25th day of September.

There were three permanent ventilators in the forward end of the tweendecks. One of these served the upper and the other two the lower tweendeck. There were also two permanent ventilators on the after end which served both the upper and lower tweendecks, that is, the pipe from the lower tweendeck extended right up through the upper tweendeck with a mushroom covering, but before leaving New York, in order to secure against the possibility of air passing through these rear ventilators from the lower to the upper tweendeck, waste was used to stuff up the vacuum.

It is contended that, because of this, insufficient ventilation was provided for the tobacco stowed in the upper tweendeck, but the ship's officers assert that while the lower hatchway was covered by a tarpaulin and tightly battened down, the upper hatchway was opened whenever weather conditions permitted, and it is significant that no damage is claimed from either sea water or sweat.

On October 1, 1933, the ship experienced heavy weather. The wind force, which the captain estimated according to the Beaufort Scale, was 7 at 5 p. m.; 8 at 6 p. m.; 9 at 7 p. m.; 10 at 8 p. m.; 8:30 p. m. to 11 p. m. 11. From 8 p. m. until midnight the vessel logged 12 and a fraction knots per hour.

On October 2d, the wind force continued at 10 until 5 a. m. and then at 9 until noon, and thereafter decreased. The ship altered her course frequently during the periods mentioned; the wind shifted from south to southwest, to northwest. The weather was moderate on October 3d and 4th, but on the evening of October 5th the wind increased, and on October 6th, at 8 a. m., registered 8; at 9 o'clock it was 10; and at 10 o'clock it was 11, which condition continued for 12 hours, and the speed during this period was reduced to 9 knots. The captain testified it was one of the two worst storms which he had experienced in his 22½ years at sea, the other having been a typhoon off the coast of Singapore some five years before.

There were two scuppers about 3 inches in diameter leading aft from the lower No. 3 tweendeck, and likewise two scuppers aft from the upper tweendeck to the engine-room bilge, at which point the outlets were 6 or 7 feet apart.

On the morning of October 7th, the chief engineer reported to the master some black color running down from the lower No. 3 tweendeck scupper pipe into the engine-room bilge on the starboard side and a bad smell emanating therefrom. Ordered by the captain to inspect the condition of the cargo, the chief officer went through the trunk hatch to upper tweendeck and thence to the lower by removing the tarpaulin and one hatch board, where he found some of the drums had broken the lashing and five of the drums were damaged and their contents flowing out accounted for the complaint of the chief engineer. The drums were restowed, which occupied a period of seven hours; the task being made difficult by the fact that the sailors thus employed were affected by the odor of the dye intermediate. Hence it is claimed that some of the tobacco in the 158 hogsheads was contaminated either through fumes which came up from the engine-room bilge through the scupper pipe, or through the aft ventilator, or by gases forming from the deposit of the dye intermediate tracked into the upper tweendeck during the restowing. It is conceded that the cargo in the upper tweendeck was discolored.

This court, following precedent, has heretofore had occasion to recognize a tendency of ship's officers to "stick by the ship" and exaggerate weather conditions to account for cargo damage. The Manuel Arnus (D. C.) 10 F.Supp. 729, affirmed M. Binkovitz & Sons v. The Manuel Arnus (C.C.A.) 80 F. (2d) 1015.

It happens however, that the Hokkai Maru was equipped with automatic steering apparatus and a Sperry Gyro Compass which automatically registered the course of the vessel. Omar B. Whittaker, who for 23 years has been employed by the manufacturer of that instrument, was called as a witness to interpret the automatic recordations. He testified that in ordinary weather the yaw of the vessel would be 1½ degrees, which, in fact, the instrument recorded on September 27th; on September 28th at 8 p. m. it was 2 degrees; on October 1st, the ship registered 7 yaws in 10 minute intervals of 10 degrees in extent; and at 8 p. m. the recordation was 17 degrees, which, he testified, showed that the vessel was moving violently by means external to its own mechanism. On October 6th at 8 a. m. the movement of the vessel registered as much as 7 yaws in a 10-minute interval, reaching 15 degrees at various times, and 20 degrees before midnight, diminishing thereafter to normal when, as the logbook showed, the weather had likewise moderated.

This evidence satisfies me that certainly on October 6th the vessel encountered such unusual weather that it amounted to "a peril of the sea."

█ I find that the stowage of the cargo of dye intermediate was proper, according to established and recognized methods, and sufficient to meet the requirements of ordinary weather which would be likely to be experienced at that season of the year.

█ It is contended, however, by the libelant, that the entry into the upper tweendeck from the lower tweendeck and the tracking of the dye intermediate from the latter into the former, a matter of a few ounces, constitutes negligence for which, under section 1 of the Harter Act (46 U.S.C.A. § 190), the ship is not relieved from liability. Libelant relies upon In re Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610.

In that case the vessel had arrived at destination in New York, had been made fast to her pier, and capsized during the

discharge of her cargo. On the Transatlantic crossing she had encountered very heavy weather; she was 36 hours late and heavily coated with ice, estimated at 'not less than 213 tons. This weight was increased by a heavy fall of snow after her arrival. Her owners argued that the danger could not have been foreseen, attributing the loss to an unusual gale and special circumstances. The District Court and the Circuit Court of Appeals (124 F. 1) agreed, however, that the loss was due to negligence in unloading the cargo, and this determination was affirmed upon the final appeal.

I do not feel that the principle there laid down applies here. On the contrary, the weather conditions encountered on October 6th made necessary the restowing of the cargo and the entry into the upper tweendeck and other cargo carrying spaces was for the purpose of inspection and restowing cargo if and where necessary for the safety of the ship and all of her cargo, and was, in my opinion, in the general course of the management of the vessel. The libel must be dismissed.

If these findings do not conform to Admiralty Rule 46½ (28 U.S.C.A. following section 723), either party may submit findings of fact and conclusions of law on five days' notice to the other.