## THE VIZCAYA.

No. 45 of 1944.

District Court, E. D. Pennsylvania.
Dec. 11, 1945.

Krusen, Evans & Shaw, by Thomas E. Byrne, Jr., all of Philadelphia, Pa., for libellant.

Rawle & Henderson, by Joseph W. Henderson, all of Philadelphia, Pa., for claimant-respondent.

KALODNER, District Judge.

This is an action in admiralty brought by the consignee to recover for cargo damage allegedly sustained during the transatlantic voyage of the steamship Vizcaya. The issues involved are: (1) Whether the cargo was received by the Vizcaya in good order and condition, (2) if so, whether the damage was attributable to perils of the sea or to the unseaworthiness of the vessel, and (3) if the latter, whether due diligence was exercised to make the Vizcaya seaworthy.

The cargo in controversy consists of bags of shelled almonds and filberts marked "B. Co." and "B.C.L." which were shipped under six through bills of lading from the ports of Alicante and Tarragona, Spain, on the vessels Darro and Ebro to Cadiz, Spain, where they were transshipped onto the Vizcaya for carriage to Philadelphia.

The through bills of lading were "clean" bills containing the usual notation of receipt for shipment in good order and condition. Also, they limited the responsibility of each carrier to its own line, and subjected the through bills to the conditions contained in the bills of lading issued by the on-carrier, the claimant-respondent here.

The Vizcaya issued six bills of lading, printed in Spanish, covering the shipment from Cadiz to Philadelphia. They did not recite that the goods were received in apparent good order and condition, but contained the printed statement, signed by the Captain, that he did not know the weight, contents, quality and condition of the cargo. On two of these bills, however, were longhand notations in Spanish, which, translated, mean "5 slack bags short contents" (bill No. 11), and "5 bags slack and resewed" (bill No. 46).

The testimony, both in court and by deposition, and the exhibits, disclose the following facts:

The Vizcaya left Cadiz on January 30, 1944, and stopped at Huelva, Spain, for bunkers. According to the testimony of the first engineer, the coal was half large pieces and half small; he tested it in the kitchen stove and discovered that the large pieces burned all right, but not the small pieces, whereupon he complained to the supplier who was new to the ship. The result of this inferior coal was to diminish the pressure so that, after leaving Huelva, the ship lost sixty to seventy knots a day in normal weather. The first engineer also stated that at Huelva he inspected the Vizcaya's machinery and found it in good order.

On February 10th, the Vizcaya left Huelva for Philadelphia, and on February 20th it began to encounter heavy seas and head winds of force six on the Beaufort Scale,[1] toward the twenty-first hour. On the 21st of February, the wind force decreased, but, after the twentieth hour rose from force 5 to force 8, in the twenty-fourth hour. On February 22nd the wind force went from 7 in the first hour to 10 in the sixteenth hour, which continued through February 23rd to the fourth hour, when it decreased to 9. On that day the wind diminished to force 6 in the twenty-fourth hour. The range of wind and·sea forces on February 24th was 7 diminishing to 5.

At about midnight on February 21st (the twenty-fourth hour), the Vizcaya's engines were stopped because the bottom of the centrifugal pump became loose and fell. Repairs were completed at about 6 P.M. on February 24th, and during this time the Vizcaya was adrift.

On February 25th, the range of the wind was force 5 increasing to force 7, and the same for the sea. On February 26th, the wind and sea varied between force 5 and force 6, but at about 8 P.M. the engines were stopped because of damage in the transmission of the steering gear, which was not repaired until 6 A.M. on February 27th. For these ten hours the Vizcaya was adrift a second time. The inability to steer the ship resulted, according to the engineer, in exposing the stern of the ship causing the propeller to race, which in turn caused "too much" vibration of the ship. Although the hand steering gear was available, the attempt to use it was not successful because of the weather.

Following the repair of the steering gear, the Captain considered the weather good, the highest wind and sea force being force 7, until March 2nd, when the wind reached force 8 for several hours. The weather for the remainder of the trip was good. However, the Captain found it necessary to make an unscheduled stop at Bermuda for coal. There he filed a protest with the Spanish Consulate on account of the bad weather. A similar protest was filed in Philadelphia.

This protest discloses that on February 22nd, the engines were stopped for three hours to clean the pipes in the boilers; that at about 12:30 A.M., February 23rd, the engines were stopped because of the break in the centrifugal pump and were not started until 4:24 P.M. February 25th, when the cement on the centrifugal pump became sufficiently hard; that on February 24th, at about 6 A.M. the ship's rail, center, port, was carried away; that on February 26th, at about 8 P.M. the steering gear broke and was not repaired until 6 A.M. on February 27th; on February 29th, the ship could not be kept on her course because of lack of pressure because of inferior coal and this continued on the 29th, the ship pitching and rolling heavily; control was not regained until about noon that day when the weather improved. On March 3rd at about 5 A.M. control was being lost because of lack of pressure, the engine was stopped and the ship remained adrift; at 6 A.M. springs in the "guarne" were broken. The day's run of March 4th was begun with stopped engines, but the translation does not disclose when they were started up.

There is no question that the cargo of almonds and filberts were discharged in a damaged condition. The surveyors for the libellants and claimant-respondent agreed that two kinds of damage were apparent, and separated the sacks of nuts accordingly. In one group were placed torn sacks marked with paint and rust; this damage was attributed to chafing of the sacks against the skin and frames of the ship. In the other group were placed sacks characterized by a lengthwise cut on the flat side of the sack; the surveyors could not determine the cause of this damage, but compared the cut to one made by a sharp instrument.

At Cadiz, the sacks of nuts which are involved here were stowed, with other sacks of nuts, in the Vizcaya's holds No. 3 and No. 4. In the hold No. 3 they were laid on a platform of dunnage over cases of wine,

---

[1] The Beaufort Scale readings are reduced to common terms in Knight's Modern Seamanship (10th ed., 1941) at page 627. The following "forces" are valuable here:

Force 6: Strong breeze, 19–24 land miles per hour

Force 7: Moderate gale or strong wind, 32–38 land miles per hour.

Force 8: Fresh gale, 39–46 land miles per hour

Force 9: Strong gale, 47–54 land miles per hour

Force 10: Whole gale, 55–63 land miles per hour

and in the No. 4 hold, on dunnage over butts of wine. The sacks were laid one layer fore-and-aft and one layer crosswise in alternate tiers from one wing of the hold to the other. In each hold there was approximately one foot of space between the sacks and the skin of the ship, and about six inches between the sacks and the ship's frames. The sacks were three tiers high in hold No. 3 and five tiers high in hold No. 4. There was no dunnage or any other kind of protection between the sacks and the skin and frames of the ship, although there was dunnage between the butts and the hull. In hold No. 3, there was about nine feet of clearance between the top of the stow of nuts and the deck, but in No. 4 hold, there clearance was about three feet in the forward part of the hold sloping to about 10 feet of clearance at the center of the stow, so that the forward part was about seven feet higher than the after part.

At the time the sacks of nuts were being transshipped at Cadiz, the testimony is that the stevedores engaged in unloading the Darro and the Ebro were using hooks; these men were not connected with the Vizcaya or its agents. The testimony also was that of the cargo of nuts, made up of a number of marks, including those involved here, some bags were torn, leaking, or short and sewing was going on at the pier; bags taken on the Vizcaya which were torn, were also being resewed. According to the first officer, who was in charge of the loading of the Vizcaya, he counted the torn and leaking bags; his notes and the cargo receipts show that of 3520 sacks, a total of 62 sacks were leaking and resewed. The first officer further stated that in counting he did not distinguish the marks on the bags, and therefore could not say whether the cargo noted as damaged applies to the cargo for which this libel is filed. However, as pointed out previously, two of the Vizcaya's six bills of lading were marked to show a total of ten damaged bags.

Although the first officer considered that the stow was proper, he said that if more dunnage were available he would have used it to protect the bags from the skin of the ship. In any event, certification of the stowage was made by the agents of Lloyds.

Finally, the evidence disclosed that in the interior of the holds there were braces extending from the sides of the ship diagonally to the deck, the brace being about five feet long, with an open space in the angle. There was testimony that, when the Vizcaya's holds were opened, some sacks were hanging in those openings. Furthermore, it appears that as the sacks were being discharged at Philadelphia large quantities of the contents were being lost through the torn and leaking sacks. The evidence is not in agreement as to when the ship's coopers began to resew bags at Philadelphia, but it is clear that loose nuts were lying in the holds and on the pier.

Coming to the contentions of the parties it is of primary importance in the consideration of the merits of this libel to note that the bills of lading here involved are subject to the United States Carriage of Goods by Sea Act, 49 Stat. 1207 (1936), 46 U.S.C.A. § 1300 et seq.; this is so regardless of the fact that they were issued in Spain. 46 U.S.C.A. §§ 1300, 1312.

First, the respondent takes the position that recovery for damages may not be had since the libellants have failed to show receipt of the merchandise by the Vizcaya in good order and condition. It is claimed that the absence in the Vizcaya's bills of lading of the usual acknowledgment of receipt in apparent good order and condition places upon the libellants the onus of affirmatively proving the good condition of the merchandise upon delivery to the Vizcaya. The Isla de Panay, 1925, 267 U.S. 260, 45 S.Ct. 269, 69 L.Ed. 603. However, in this connection I think it necessary to consider that the damage was of two types, and the sacks were divided accordingly. As to one group of sacks, the cause of the damage was not determined; as to the other, the evidence was clear and concise that the bags were marked with paint and rust stains from contact with the ship's skin and frames. The surveyors of both parties were in agreement as to the cause of the damage to this group of bags, and no conclusion is available except that the damage occurred on board the Vizcaya. In the light of this conclusion therefore, the question of condition at the time of receipt by the Vizcaya is not material; this is particularly so in view of the evidence that the bags were otherwise suited for the purpose for which they were used.

The group of sacks damaged by an undetermined cause presents a more difficult situation. The question of burden of proof

has been strongly argued. The situation is one of first impression with reference to Section 3 (3) (c) of the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. § 1303(3) (c). Moreover, the construction of that Act is complicated by the decision in The Isla de Panay, supra, insofar as that case is based on a comparable provision in the Harter Act, 27 Stat. 445 (1893), 46 U.S.C.A. § 193. Although that case, and cases like New England Newspaper Pub. Co. v. United States (The West Campgaw and The West Harcuvar), D.C.D.Mass., 18 F. Supp. 674, 1937 A.M.C. 427, and The Boveric, D.C.S.D.N.Y., 1924 A.M.C. 1045, are readily distinguishable on their facts, the broad language expressed therein seems to preclude the libellants here from taking advantage of the recitation of good order and condition contained in the through bills of lading as against the Vizcaya. However, the libellants claim the benefit of an inference, from the notations of bad order on some of the Vizcaya's bills of lading, that the remainder of the shipment was in good order.

While a nice question of law is thus presented, it seems to me that, in view of the evidence, consideration of the controversial issues raised is not necessary here. The respondent, although steadfastly maintaining that the libellants have the burden of establishing good order and condition at the time of receipt by the Vizcaya, has nevertheless gone forward to show bad order and condition. The testimony is clear and uncontradicted that the stevedores engaged in unloading the Darro and the Ebro used sharp-pointed metal hooks and that many sacks of nuts were torn thereby. The testimony of the surveyors of both parties is in agreement that the tears in the sacks of this group were made by a sharp-pointed instrument. The inference, I think, is patent and logical; no other explanation for the peculiar damage was offered by the libellants, and no other is suggested by the evidence.

■ In my opinion, therefore, the Vizcaya has shown at least a prima facie case of damage due to no fault of its own with respect to this particular group of sacks. In the absence of an assertion of, or factors which would make applicable, the theory of estoppel, it appears that the Vizcaya has done as much as would be required of it if the libellants were given the benefit of the rule that acknowledgment in

a bill of lading of receipt in good order and condition is prima facie evidence of that condition, for the rule is well-settled and even where the bill of lading contains such a recitation, the vessel may introduce evidence rebutting the presumption. See Thomas Roberts & Co. v. Calmar Steamship Corp., D.C.E.D.Pa., 59 F.Supp. 203, 1945 A.M.C. 375, and cases cited therein. The same reasoning must apply to the argument that a notation of some damage leaves the inference that the remainder of the shipment was in good order.

Second, the respondent contends that such damage as did occur on board the Vizcaya was entirely the result of perils of the sea; and not, as the libellants protest, due to improper stowage or unseaworthiness.

■ The evidence pertinent to this issue has already been set out at length. The burden, of course, where the damage has occurred on board, is upon the claimant-respondent to bring that damage within the exceptive provisions of the bills of lading, or to show that the damage did not occur through negligence. Carriage of Goods by Sea Act, supra; Schnell v. The Vallescura, 1934, 293 U.S. 296, 306, 55 S.Ct. 194, 79 L.Ed. 373; The Vermont, D.C.E.D.N. Y. 1942, 47 F.Supp. 877, 880.

■ The bills of lading issued by the Vizcaya contain the common exceptive provisions which seek to eliminate liability for breakage, leakage, accidents of engines, boilers, etc., sweat, rust, and others. The rule under the Harter Act appears to be that, where the ship successfully brings the damage within one of such exceptive provisions, the burden falls upon the libellant to show negligence. See Thomas Roberts & Co. v. Calmar Steamship Corp., supra. However, an examination of the cases discloses that under Section 4(2) (q) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2) (q), the burden remains with the respondent to show that fault or neglect did not contribute to the damage. Eppens, Smith Co., Inc., v. Silver Line, Ltd., 5 Cir., 1942, 128 F.2d 882; The Vermont, supra; The Lady Drake, K.B. in App., 1936 A.M. C. 998, 999; The Tulsa, D.C.S.D.Ga., 63, F.Supp. 895, 1941 A.M.C. 1474, 1477; The Asturias, D.C.S.D.N.Y., 40 F.Supp. 168, 1941 A.M.C. 761.

■■ Under the Act, also, neither the carrier nor the ship is liable for loss or

damage resulting from unseaworthiness unless caused by want of due diligence to make the ship seaworthy; nor is either responsible for loss or damage resulting from perils of the sea. That the burden with respect to these matters, however, rests upon the ship or carrier to bring all the damages within the exceptive provisions of the statute is undisputed law. The Silvia, 1871, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Schnell v. The Vallescura, supra; The Rosalia, 2 Cir., 1920, 264 F. 285; The Mauretania, 2 Cir., 84 F.2d 408, 1936 A.M.C. 1130; Ore Steamship Corp. v. D/S A/S Hassel, 2 Cir., 1943, 137 F.2d 326, 329.

On the theory of The Indien, 9 Cir., 71 F.2d 752, 1934 A.M.C. 1050, 1057, the libellants assert that the Vizcaya was unseaworthy because no dunnage was placed between the tiers of sacks and the skin and frames of the ship. It is contended that dunnage was necessary for the safe carriage of the cargo, for rough weather was to be expected on a transatlantic voyage during the winter season and commensurate care in stowage was required. See The Schickshinny, D.C.S.D.Ga.1942, 45 F.Supp. 813, 819. I think, however, that this issue may be passed over, and for the purposes of this discussion it may be assumed that the absence of dunnage was proper. Nevertheless, I am of the opinion that the responsibility of the claimant-respondent for the damage is inescapable.

▇▇▇ The contention that the damage was occasioned by perils of the sea is, in my estimation, ill-founded. True, the weather at times was severe, but considering that the voyage involved crossing the North Atlantic in the winter season, it cannot be said that the weather encountered was not to be anticipated. The weather was not "catastrophic," or "of such a nature" as to constitute a good exception in the statute or the bills of lading.[2] The nature of the weather to be expected during February in the Atlantic is set forth in The Manuel Arnus, D.C.S.D.N.Y., 10 F.Supp. 729, 1935 A.M.C. 786, which also determines that breakage of a deck rail is not decisive. Furthermore, that the worst weather encountered by the Vizcaya was expectable has already been judicially determined. Cf. Ore Steamship Corp. v. D/S A/S Hassell,

supra; The Cypria (R. Masso & Cia v. Cypria), D.C.S.D.N.Y., 46 F.Supp. 816, 1942 A.M.C. 985. As stated in Weil, Inc., v. American West African Line (The West Kebar), 2 Cir., 147 F.2d 363, at page 366, 1945 A.M.C. 191, at page 196, "Even 'whole gales'—are to be expected in such waters at such a season." See also, The Hokkai Maru, D.C.S.D.N.Y., 17 F.Supp. 249, 1936 A.M.C. 1609; The City of Khios, D.C.S.D. N.Y., 16 F.Supp. 923, 1936 A.M.C. 1291.

▇▇▇ The proper approach is indicated in Societa Anonima, etc., v. Federal Ins. Co. (The Ettore), 2 Cir., 62 F.2d 769, at page 771, 1933 A.M.C. 323, at page 326: "Gales are likely at all seasons in the Atlantic, and this was at most not more. She should have been able to withstand it, else she was not reasonably fit for the duties she had undertaken, and was therefore not seaworthy. The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 191 U.S. 1, 8, 9, 24 S.Ct. 1, 48 L.Ed. 65." The case comes down to this, then, whether the Vizcaya was seaworthy for the voyage, and in my opinion it is clear on the evidence that the Vizcaya was not seaworthy when it sailed from Huelva, nor was due diligence exercised to make her seaworthy.

Foremost in importance is the fact that the bunkers taken on at Huelva were inferior. The simple test used by the chief engineer, burning the coal in the kitchen stove, revealed that half of it would not burn properly. Throughout the trip from Huelva to Bermuda, the Vizcaya was seriously hampered by the inferiority of the coal, for pressure was never sufficient. Lack of sufficient pressure not only interfered with maneuverability during the severe stages of the storm, so that the ship could not be kept on her course, but reduced control on several occasions to the point where it was non-existent. Thus, the Captain's log, for February 29th, as translated in the protest made at Philadelphia, reads: "We start today's Run with very hard wind from the West; heavy sea from same and to the North, forcing the ship to big rolls and pitches with extra work for the engine, hull, etc., leaving the ship with no control practically, because of the low pressure due to the bad quality of the coal.

---

[2] See The Warren Adams, 2 Cir., 1896, 74 F. 413, 415; The Giulia, 2 Cir., 1914, 218 F. 744, 748; The Rosalia, 2 Cir., 1920, 264 F. 285; Duche v. Thomas & John Brocklebank (The Makalla), 2 Cir., 1930, 40 F.2d 418; Philippine Sugar Centrals Agency v. Kokusai Kisen, etc., (The Naples Maru), 2 Cir., 106 F.2d 32, 1939 A.M.C. 1087.

\* \* \* At dawn in the same condition." For March 3rd, we find: "At 5h 05 min. the ship started to lose its control because of lack of pressure to continue in the anotated course, and we are forced to stop the engine remaining adrift." The weather condition at the stated times was considered by the Captain to be good, the wind and sea not rising at any time above force 8. That weather clearly does not amount to a "peril of the sea." The Mauretania, supra; The Emilia, D.C.S.D.N.Y., 13 F. Supp. 7, 1936 A.M.C. 22; and see, The Indien, supra.

The evidence, I think, manifestly permits the inference that the inferior coal was sufficient to cause the ship to suffer more severely from the weather insofar as pitching, rolling and vibration are concerned, than might otherwise have been the case; even assuming that the stow was proper for the weather encountered the inference is plain 'that the inferiority of the coal caused or contributed to the chafing of the sacks against the unprotected skin and frames of the ship. Cf. Huilever, S.A. Division Huileries Du Congo Belge v. The Otho, 2 Cir., 1944, 139 F.2d 748, 750.

The evidence as to unseaworthiness causing or contributing to the damage does not stop there. The facts are that the Vizcaya was adrift for two days because the centrifugal pump broke down and for ten hours because the steering mechanism jammed. At the time of the latter accident, the wind and sea were measured at force 5. At the time of the former breakdown, which, according to the chief engineer, occurred at midnight between February 21 and 22, the wind was at force 8, and the sea at force 6.[3] The chief engineer ascribed as the cause of these accidents the heavy weather. However, as has already been demonstrated, such conditions did not constitute a peril of the sea and no less can be asked than that the Vizcaya should have successfully met such weather, for where a vessel is subjected to no greater risk than might reasonably have been anticipated on the voyage, the "peril of the sea" furnishes no immunity. See Weil, Inc., v. American West African Line (The West Kebar), supra, 147 F.2d at page 367, 1945 A.M.C. at page 196; The Schickshinny, supra, 45 F.Supp. at page 817.

True, the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304, relieves of liability where the defects were latent and where due diligence was exercised to make the ship seaworthy. Here, however, it is not contended that the defects were latent. As to the exercise of due diligence, the only evidence is that the chief engineer "inspected" the machinery and found everything fit. But this is insufficient, for I feel that information as to the care and extent of the inspection is of vital importance. Thus, it has been held that a visual inspection is "inadequate." Huilever, S.A. Division Huileries Du Congo Belge v. The Otho, supra. In any event, if there is any doubt as to the unseaworthiness of the vessel, that doubt must be resolved against the shipowner. The Southwark, 1903, 191 U.S. 1, 14, 24 S.Ct. 1, 48 L.Ed. 65; Bank Line v. Porter, 4 Cir., 1928, 25 F.2d 843, 845; The Bill, D.C., 47 F.Supp. 969. Here, again, I regard it as a justifiable inference that this unseaworthiness, resulting in setting the Vizcaya adrift during severe weather, was the proximate cause of, or at least a contributing factor in, the damage to the sacks of nuts. Even if the weather did amount to a "peril of the sea", the burden is on the respondent to separate the damages. Schnell v. The Vallescura, supra; Weil v. American West African Line (The West Kebar), supra. The only other conclusion is that the lack of dunnage was improper for the kind of weather expectable during the trip.

Accordingly, having considered all of the evidence and the arguments of counsel, I make the following

### Findings of Fact

1. Mitchel Beck and John Vokiener are co-partners trading as Mitchel Beck Company.

2. The S. S. Vizcaya is owned and operated by Compania Anonima Maritima Union, a Spanish corporation.

3. This Court has jurisdiction over the subject matter, the parties and the ship.

4. During January, 1944, six shipments of almonds and filberts were shipped by various shippers in Spain. Six through bills of lading were issued by Emilio Huart providing for carriage from the ports of

---

[3] The Captain's log and the chief-engineer's testimony from his log differ as to the time and I have accepted the latter's testimony. See Weil, Inc., v. American West African Line (The West Kebar), supra, 147 F.2d at page 366, 1945 A.M.C. at page 195, although it is not decisive since I have concluded that the worst weather encountered did not amount to a "peril of the sea."

Alicante and Tarragona, Spain, to Philadelphia, Pennsylvania.

5. The ocean carriers from Alicante and Tarragona, Spain, were the Ebro and the Darro, neither of which was owned, operated or controlled by the claimant-respondent.

6. The said through bills of lading provided for transshipment of the merchandise at Cadiz to the Vizcaya.

7. The through bills of lading acknowledge receipt of the merchandise in apparent good order and condition.

8. There is no evidence that, at the time he issued the through bills of lading, Emilio Huart was acting for the Vizcaya or the respondent. He was the Vizcaya's agent at Cadiz at the time of the loading thereon.

9. Upon arrival at Cadiz the Ebro and Darro discharged the bags of filberts and almonds, employing stevedores who used hooks in the course of handling the bags.

10. The bags of filberts and almonds were placed on the dock at Cadiz, from which point they were shortly thereafter loaded aboard the Steamship Vizcaya for carriage to Philadelphia.

11. While the bags of filberts and almonds were on the dock prior to being loaded on the Vizcaya, many of the said bags were found to be cut, torn, slack, leaking and in other than good condition.

12. Some of the cut and torn bags were re-sewed on the dock and others were re-sewed on board the Vizcaya before being stowed in the holds.

13. Bad order notations were made on dock receipts in respect to sixty-two such bags.

14. Captain Arana of the Vizcaya issued six ocean bills of lading covering the several parts of the shipment consigned to libellants' designee, with bad order notations on Bills of Lading No. 11, No. 46 and No. 48.

15. Each of the six bills of lading issued by the Vizcaya to cover libellants' goods provided for shipment of the same from Cadiz to Philadelphia, freight from Cadiz to Philadelphia only, with certain exceptions for damage.

16. Each of the said bills of lading stated that it was "to be delivered against original B/L" issued for the same parcel at the point of original shipment.

17. The bills of lading issued by the Vizcaya at Cadiz contained a printed provision stating: "I do not know the weight contents, quality and condition of the merchandise and I am not responsible for breakage or spillage," under which appears the signature of Captain Arana.

18. The bags of filberts and almonds were stowed in Holds No. 3 and No. 4 of the Vizcaya. They were laid flat on a platform of dunnage over cases of wine in Hold No. 3, and over a similar platform over butts of wine in Hold No. 4. The bags were overlapping, the bottom tier running fore-and-aft, the second tier running cross-wise, and so on in alternate tiers. The bags were placed three tiers high in Hold No. 3 and five tiers high in Hold No. 4, and extended from wing to wing except for a space between the outer edge of the stow and the skin of the ship estimated to be one foot wide, and a space of about six inches between the sacks and the frames of the ship, which were exposed.

19. The Vizcaya had a series of metal braces or frames which extended diagonally from the sides of the holds to the under side of the deck, the purpose being to support the deck. These protruded into the cargo carrying space of the holds.

20. Some of the sacks of nuts were piled so that the tops of the piles extended above the frames or braces.

21. No dunnage or other protection was placed along the sides of the stow of sacks or against the exposed ribs and sides of the hold to protect the sacks from damage or to hold them in position.

22. The sacks in which the nuts were packed were of good and sufficient quality, and of the type and kind customarily used for such shipments.

23. A certificate of good stowage was issued for the Vizcaya at Cadiz by the agents of Lloyd's underwriters.

24. The Vizcaya encountered heavy seas and high winds ranging up to force 10 on the Beaufort scale in the course of her voyage between Huelva, where she stopped for bunkers, and Bermuda, to which she deviated to obtain additional coal.

25. The coal taken on at Huelva was inferior. This was determinable upon the exercise of due diligence, and was known at the time of departure from that port.

26. Because of the inferiority of the coal, pressure was never sufficient for the trip, and at certain times complete control

906

was lost leaving the Vizcaya adrift at the mercy of the weather.

27. During the trip, the centrifugal pump broke down, and the steering apparatus jammed, leaving the Vizcaya adrift in severe weather for two days and for ten hours on each occasion.

28. The weather encountered on the voyage, while severe, was not of unexpected severity and was such that it should have been anticipated during a westward crossing of the North Atlantic in winter.

29. Many of the sacks of nuts were found to be damaged upon arrival of the Vizcaya in Philadelphia and much of the contents was lost upon discharge.

30. The damaged sacks were divided into two groups. The first group was distinguished by a cut lengthwise on the flat side of each sack apparently cut by a sharp-pointed instrument; the second group by tears resulting from chafing of the sack against the skin and/or frames of the Vizcaya as evidenced by the rust and paint marks visible at the place of the tear.

31. The damage to the second group of sacks was caused in whole or in part by the failure on the part of the claimant-respondent, the ship, its officers or men to exercise due diligence to make the Vizcaya seaworthy and reasonably fit for the carriage of its cargo across the Atlantic in the winter season.

I state the following

## Conclusions of Law

1. The libellants were the owners of the goods in question and are entitled to recover in this action.

2. The Court has jurisdiction over the Vizcaya in rem and Compania Anonima Maritima Union in personam.

3. Claimant-respondent and the Vizcaya are not liable for the damage to the first group of sacks as described above in Finding of Fact No. 30.

4. Claimant-respondent and the Vizcaya are liable for the damage to the second group of sacks as described in Finding of Fact No. 30, since that damage was caused, all or in part, by the unseaworthiness of the Vizcaya in respect to which due diligence was not exercised.

An Order may be submitted in proper form in conformity with this Opinion, including a provision for a reference to a Special Master to find damages.